## WRIGHT, WARDEN, ET AL. *v.* WEST

No. 91–542.   Argued March 24, 1992—Decided June 19, 1992

THOMAS, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and SCALIA, J., joined. WHITE, J., filed an opinion concurring in the judgment, *post,* p. 297. O'CONNOR, J., filed an opinion concurring in the judgment, in which BLACKMUN and STEVENS, JJ., joined, *post,* p. 297. KENNEDY, J., *post,* p. 306, and SOUTER, J., *post,* p. 310, filed opinions concurring in the judgment.

*Donald R. Curry,* Senior Assistant Attorney General of Virginia, argued the cause for petitioners. With him on the briefs were *Mary Sue Terry,* Attorney General, *H. Lane Kneedler,* Chief Deputy Attorney General, *Stephen D. Rosenthal,* Deputy Attorney General, and *Jerry P. Slonaker,* Senior Assistant Attorney General.

*Maureen E. Mahoney*, Deputy Solicitor General, argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Assistant Attorney General Mueller*, and *Deputy Solicitor General Roberts*.

*Steven H. Goldblatt* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Robert A. Butterworth*, Attorney General of Florida, and *Richard B. Martell*, Assistant Attorney General, *Charles E. Cole*, Attorney General of Alaska, *Grant Woods*, Attorney General of Arizona, *Winston Bryant*, Attorney General of Arkansas, *Daniel E. Lungren*, Attorney General of California, *Gale A. Norton*, Attorney General of Colorado, *Richard N. Palmer*, Chief State's Attorney of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Michael J. Bowers*, Attorney General of Georgia, *Warren Price III*, Attorney General of Hawaii, *Larry EchoHawk*, Attorney General of Idaho, *Linley E. Pearson*, Attorney General of Indiana, *Bonnie J. Campbell*, Attorney General of Iowa, *Robert T. Stephen*, Attorney General of Kansas, *Chris Gorman*, Attorney General of Kentucky, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Michael C. Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Marc Racicot*, Attorney General of Montana, *Don Stenberg*, Attorney General of Nebraska, *Frankie Sue Del Papa*, Attorney General of Nevada, *John P. Arnold*, Attorney General of New Hampshire, *Robert J. Del Tufo*, Attorney General of New Jersey, *Tom Udall*, Attorney General of New Mexico, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Susan B. Loving*, Attorney General of Oklahoma, *Charles S. Crookham*, Attorney General of Oregon, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *T. Travis Medlock*, Attorney General of South Carolina, *Mark Barnett*, Attorney General of South Dakota, *Dan Morales*, Attorney General of Texas, *Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Kenneth O. Eikenberry*, Attorney General of Washington, *Mario J. Palumbo*, Attorney General of West Virginia, and *Joseph B. Meyer*, Attorney General of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*.

*Leslie A. Harris, Steven R. Shapiro*, and *John A. Powell* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of New York et al. by *Robert Abrams*, Attorney General of New York, *Lee Fisher*, Attorney

JUSTICE THOMAS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and JUSTICE SCALIA joined.

In this case, we must determine whether the Court of Appeals for the Fourth Circuit correctly applied our decision in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), in concluding that the evidence against respondent Frank West was insufficient, as a matter of due process, to support his state-court conviction for grand larceny.

I

Between December 13 and December 26, 1978, someone broke into the Westmoreland County, Virginia, home of Angelo Cardova and stole items valued at approximately $3,500. On January 10, 1979, police conducted a lawful search of the Gloucester County, Virginia, home of West and his wife. They discovered several of the items stolen from the Cardova home, including various electronic equipment (two television sets and a record player); articles of clothing (an imitation mink coat with the name "Esther" embroidered in it, a silk jacket emblazoned "Korea 1970," and a pair of shoes); decorations (several wood carvings and a mounted lobster); and miscellaneous household objects (a mirror framed with seashells, a coffee table, a bar, a sleeping bag, and some silverware). These items were valued at approximately $800, and the police recovered other, unspecified items of Cardova's property with an approximate value of $300.

West was charged with grand larceny. Testifying at trial on his own behalf, he admitted to a prior felony conviction, but denied having taken anything from Cardova's house.

General of Ohio, *Jerry Boone*, Solicitor General of New York, *Peter H. Schiff*, Deputy Solicitor General, and *Martin A. Hotvet*, Assistant Attorney General; for Senator Biden et al. by *William F. Sheehan* and *Christopher E. Palmer*; for the American Bar Association by *Talbot D'Alemberte* and *Seth P. Waxman*; for Benjamin R. Civiletti et al. by *Douglas G. Robinson* and *James S. Liebman*; and for Gerald Gunther et al. by *Larry W. Yackle*.

He explained that he had bought and sold "a lot of . . . merchandise" from "several guys" at "flea bargain places" where, according to West, "a lot of times you buy things . . . that are stolen" although "you never know it." App. 21. On cross-examination, West said that he had bought many of the stolen items from a Ronnie Elkins, whom West claimed to have known for years. West testified that he purchased one of the wood carvings, the jacket, mounted lobster, mirror, and bar from Elkins for about $500. West initially guessed, and then twice positively asserted, that this sale occurred before January 1, 1979. In addition, West claimed to have purchased the coat from Elkins for $5 around January 1, 1979. His testimony did not make clear whether he was describing one transaction or two, whether there were any other transactions between himself and Elkins, where the transactions occurred, and whether the transactions occurred at flea markets.[1] West testified further that he had purchased one of

---

[1] The quality of West's testimony on these matters can best be appreciated by example:

"Q Are those items that you bought at a flea market?

"A Well, I didn't buy these items at a flea market, no sir.

"Q Whose items are they?

"A They are some items that I got from a Ronnie Elkins.

"Q All of the items you bought from him?

"A I can't say all.

"Q Which ones did you buy from him?

"A I can't say, because I don't have an inventory.

"Q Can you tell me the ones you bought from Ronnie Elkins?

"A Yes, I am sure I can.

"Q Which ones?

"A I would say the platter.

"Q How about the sea shell mirror?

"A Yes, sir, I think so.

"Q Where did you buy that?

"A In Newport News at a flea market." App. 21-22.

"Q I want to know about your business transactions with Ronnie Elkins.

the television sets in an entirely separate transaction in Goochland County, from an individual whose name he had forgotten. Finally, West testified that he did not remember how he had acquired the second television, the coffee table, and the silverware.

Under then-applicable Virginia law, grand larceny was defined as the wrongful and nonconsensual taking of property worth at least $100, with the intent to deprive the owner of it permanently. See Va. Code Ann. § 18.2–95 (1975); *Skeeter v. Commonwealth*, 217 Va. 722, 725, 232 S. E. 2d 756, 758 (1977). Virginia law permits an inference that a person who fails to explain, or falsely explains, his exclusive possession of recently stolen property is the thief. See, *e. g., Moehring v. Commonwealth*, 223 Va. 564, 568, 290 S. E. 2d 891, 893 (1982); *Best v. Commonwealth*, 222 Va. 387, 389, 282 S. E. 2d 16, 17 (1981). The trial court instructed the jurors about this permissive inference, but warned that the inference did not compromise their constitutional obligation to acquit unless they found that the State had established every element

---

"A I buy and sell different items from different individuals at flea markets.

"Q Tell us where that market is.

"A In Richmond. You have them in Gloucester.

"Q Where is Ronnie Elkins' flea market?

"A He does not have one.

"Q Didn't you say you bought some items from Ronnie Elkins?

"A At a flea market.

"Q Tell the jury where that is at [sic].

"A In Gloucester.

"Q Tell the jury about this flea market and Ronnie Elkins, some time around January 1, and these items, not the other items.

"A Ronnie Elkins does not own a flea market.

"Q Tell the jury, if you will, where Ronnie Elkins was on the day that you bought the items?

"A I don't remember. It was before January 1.

"Q Where was it?

"A I bought stuff from him in Richmond, Gloucester, and Newport News." *Id.*, at 26–27.

of the crime beyond a reasonable doubt. See *In re Winship*, 397 U. S. 358 (1970).[2]

The jury returned a guilty verdict, and West received a 10-year prison sentence. West petitioned for an appeal, contending (among other things) that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. In May 1980, the Supreme Court of Virginia refused the petition—a disposition indicating that the court found the petition without merit, see *Saunders* v. *Reynolds*, 214 Va. 697, 700, 204 S. E. 2d 421, 424 (1974). Seven years later, West filed a petition for a writ of habeas corpus in the same court, supported by an affidavit executed by Ronnie Elkins in April 1987. West renewed his claim that the original trial record contained insufficient evidence to support the conviction, and he argued in the alternative that Elkins' affidavit, which tended to corroborate West's trial testimony in certain respects, constituted new evidence entitling him to a new trial. The Supreme Court of Virginia again denied relief. West then filed a petition for a writ of habeas corpus in the District Court for the Eastern District of Virginia, which rejected both claims and denied relief.

The Court of Appeals for the Fourth Circuit reversed. 931 F. 2d 262 (1991). As the court correctly recognized, a

---

[2] The instruction on the permissive inference read:

"If you belie[ve] from the evidence beyond a reasonable doubt that property of a value of $100.00 or more was stolen from Angelo F. C[a]rdova, and that it was recently thereafter found in the exclusive and personal possession of the defendant, and that such possession has been unexplained or falsely denied by the defendant, then such possession is sufficient to raise an inference that the defendant was the thief; and if such inference, taking into consideration the whole evidence, leads you to believe beyond a reasonable doubt that the defendant committed the theft, then you shall find the defendant guilty." App. 34.

Several other instructions emphasized that despite the permissive inference, "[t]he burden is upon the Commonwealth to prove by the evidence beyond a reasonable doubt every material and necessary element of the offense charged against the defendant." *Ibid.*

claim that evidence is insufficient to support a conviction as a matter of due process depends on "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson* v. *Virginia*, 443 U. S., at 319 (emphasis in original). Five considerations led the court to conclude that this standard was not met: first, the items were recovered no sooner than two weeks after they had been stolen; second, only about a third of the items stolen from Cardova (measured by value) were recovered from West; third, the items were found in West's house in plain view, and not hidden away as contraband; fourth, West's explanation of his possession was not so "inherently implausible," even if it were disbelieved, that it could "fairly be treated as positive evidence of guilt"; and fifth, there was no corroborating evidence (such as fingerprints or eyewitness testimony) beyond the fact of mere possession. See 931 F. 2d, at 268–270. The court viewed West's testimony as "at most, a neutral factor," *id.*, at 270, despite noting his "confusion" about the details of his alleged purchases, *id.*, at 269, and despite conceding that his testimony "at first blush . . . may itself seem incredible," *id.*, at 270, n. 7. In holding that the *Jackson* standard was not met, the court did not take into consideration the fact that the Supreme Court of Virginia had twice previously concluded otherwise.

After the Fourth Circuit denied rehearing en banc by an equally divided court, see App. to Pet. for Cert. 34–35, the warden and the State Attorney General sought review in this Court on, among other questions, whether the Court of Appeals had applied *Jackson* correctly in this case. We granted certiorari, 502 U. S. 1012 (1991), and requested additional briefing on the question whether a federal habeas court should afford deference to state-court determinations applying law to the specific facts of a case, 502 U. S. 1021 (1991). We now reverse.

## II

The habeas corpus statute permits a federal court to entertain a petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. § 2254(a). The court must "dispose of the matter as law and justice require." § 2243. For much of our history, we interpreted these bare guidelines and their predecessors to reflect the common-law principle that a prisoner seeking a writ of habeas corpus could challenge only the jurisdiction of the court that had rendered the judgment under which he was in custody. See, *e. g., In re Wood,* 140 U. S. 278, 285–287 (1891) (Harlan, J.); *Ex parte Watkins,* 3 Pet. 193, 202 (1830) (Marshall, C. J.). Gradually, we began to expand the category of claims deemed to be jurisdictional for habeas purposes. See, *e. g., Ex parte Siebold,* 100 U. S. 371, 377 (1880) (court without jurisdiction to impose sentence under unconstitutional statute); *Ex parte Lange,* 18 Wall. 163, 176 (1874) (court without jurisdiction to impose sentence not authorized by statute). Next, we began to recognize federal claims by state prisoners if no state court had provided a full and fair opportunity to litigate those claims. See, *e. g., Moore* v. *Dempsey,* 261 U. S. 86, 91–92 (1923); *Frank* v. *Mangum,* 237 U. S. 309, 335–336 (1915). Before 1953, however, the inverse of this rule also remained true: Absent an alleged jurisdictional defect, "habeas corpus would not lie for a [state] prisoner . . . if he had been given an adequate opportunity to obtain full and fair consideration of his federal claim in the state courts." *Fay* v. *Noia,* 372 U. S. 391, 459–460 (1963) (Harlan, J., dissenting). See generally Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 478–499 (1963). In other words, the state-court judgment was entitled to *"absolute* respect," *Kuhlmann* v. *Wil-*

*son,* 477 U. S. 436, 446 (1986) (opinion of Powell, J.) (emphasis added), and a federal habeas court could not review it even for reasonableness.[3]

---

[3] JUSTICE O'CONNOR offers three criticisms of our summary of the history of habeas corpus before 1953, none of which we find convincing. First, she contends that the full-and-fair litigation standard in *Frank* v. *Mangum,* 237 U. S. 309 (1915), and *Moore* v. *Dempsey,* 261 U. S. 86 (1923), served no purpose other than to define the scope of the underlying alleged constitutional violation. See *post,* at 297–299. *Frank* and *Moore* involved claims, rejected by the state appellate courts, that a trial had been so dominated by a mob as to violate due process. In *Frank,* we denied relief not because the state appellate court had decided the federal claim *correctly* (the relevant question on direct review), and not even because the state appellate court had decided the federal claim *reasonably,* but only "because Frank's federal claims had been considered by a competent and unbiased state tribunal," *Stone* v. *Powell,* 428 U. S. 465, 476 (1976). In *Moore,* which reaffirmed *Frank* expressly, see 261 U. S., at 90–91, we ordered the District Court to consider the mob domination claim on the merits because the state appellate court's "perfunctory treatment" of it "was not in fact acceptable corrective process." *Noia,* 372 U. S., at 458 (Harlan, J., dissenting); see also Bator, 76 Harv. L. Rev., at 488–489. In both cases, a claim that the habeas petitioner had been denied due process *at trial* was not cognizable on habeas unless the petitioner *also* had been denied a full and fair opportunity to raise that claim *on appeal.*

Second, JUSTICE O'CONNOR states that we mischaracterize the views of Justice Powell about the history of habeas law between 1915 and 1953. See *post,* at 299. In fact, however, Justice Powell has often recounted exactly the same familiar history that we summarize above. In *Rose* v. *Mitchell,* 443 U. S. 545 (1979), for example, he described *Frank* as having "modestly expanded" the "scope of the writ" in order to "encompass those cases where the defendant's federal constitutional claims had not been considered in the state-court proceeding." 443 U. S., at 580 (opinion concurring in judgment). Similarly, in *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973), he described *Frank* as having extended "[t]he scope of federal habeas corpus" to permit consideration of "whether the applicant had been given an adequate opportunity in state court to raise his constitutional claims." 412 U. S., at 255–256 (concurring opinion). In neither case, nor in *Kuhlmann,* did Justice Powell even suggest that federal habeas was available before 1953 to a prisoner who had received a full and fair opportunity to litigate his federal claim in state court.

Third, JUSTICE O'CONNOR criticizes our failure to acknowledge *Salinger* v. *Loisel,* 265 U. S. 224 (1924), which she describes as the first case ex-

We rejected the principle of absolute deference in our landmark decision in *Brown* v. *Allen,* 344 U. S. 443 (1953). There, we held that a state-court judgment of conviction "is not *res judicata*" on federal habeas with respect to federal constitutional claims, *id.,* at 458, even if the state court has rejected all such claims after a full and fair hearing. Instead, we held, a district court must determine whether the state-court adjudication "has resulted in a satisfactory conclusion." *Id.,* at 463. We had no occasion to explore in detail the question whether a "satisfactory" conclusion was one that the habeas court considered *correct,* as opposed to merely *reasonable,* because we concluded that the constitutional claims advanced in *Brown* itself would fail even if the state courts' rejection of them were reconsidered *de novo.* See *id.,* at 465–476. Nonetheless, we indicated that the federal courts enjoy at least the discretion to take into consideration the fact that a state court has previously rejected the federal claims asserted on habeas. See *id.,* at 465 ("As the state and federal courts have the same responsibilities to protect persons from violation of their constitutional rights, we conclude that a federal district court may decline, without a rehearing of the facts, to award a writ of habeas corpus to a state prisoner where the legality of such detention has been

---

plicitly to hold that *"res judicata* is not strictly followed on federal habeas." *Post,* at 299. *Salinger,* however, involved the degree of preclusive effect of a habeas judgment upon *subsequent* habeas petitions filed by a *federal* prisoner. This case, of course, involves the degree of preclusive effect of a criminal conviction upon an *initial* habeas petition filed by a *state* prisoner. We cannot fault ourselves for limiting our focus to the latter context. But even assuming its relevance, *Salinger* hardly advances the position advocated by JUSTICE O'CONNOR that a habeas court must exercise *de novo* review with respect to mixed questions of law and fact. Despite acknowledging that a prior habeas judgment is not entitled to absolute preclusive effect under the doctrine of res judicata, *Salinger* also indicated that the prior habeas judgment *"may* be considered, and even given controlling weight." 265 U. S., at 231 (emphasis added).

determined, on the facts presented, by the highest state court with jurisdiction").[4]

In an influential separate opinion endorsed by a majority of the Court, Justice Frankfurter also rejected the principle of absolute deference to fairly litigated state-court judgments. He emphasized that a state-court determination of federal constitutional law is not "binding" on federal habeas, *id.*, at 506, regardless of whether the determination involves a pure question of law, *ibid.*, or a "so-called mixed questio[n]" requiring the application of law to fact, *id.*, at 507. Nonetheless, he stated quite explicitly that a "prior State determination may guide [the] discretion [of the district court] in deciding upon the appropriate course to be followed in disposing of the application." *Id.*, at 500. Discussing mixed questions specifically, he noted further that "there is no need for the federal judge, if he could, to shut his eyes to the State consideration." *Id.*, at 508.[5]

---

[4] JUSTICE O'CONNOR contends that the inclusion of this passage in a section of our opinion entitled "Right to a Plenary Hearing" makes clear that we were discussing only the resolution of *factual* questions. See *post*, at 300–301. In our introduction to that section, however, we indicated that both factual and legal questions were at issue. See 344 U. S., at 460 (noting contentions "that the District Court committed error when it took no evidence *and heard no argument on the federal constitutional issues*" (emphasis added)). Indeed, if only factual questions were at issue, we would have authorized a denial of the writ not whenever the state-court proceeding "has resulted in a satisfactory *conclusion*" (as we did), *id.*, at 463 (emphasis added), but only whenever the state-court proceeding has resulted in satisfactory *factfinding*.

[5] JUSTICE O'CONNOR quotes Justice Frankfurter for the proposition that a district judge on habeas " '*must exercise his own judgment*' " with respect to mixed questions. *Post*, at 300 (quoting 344 U. S., at 507). Although we agree with JUSTICE O'CONNOR that this passage by itself suggests a *de novo* standard, it is not easily reconciled with Justice Frankfurter's later statement that "there is no need for the federal judge, if he could, to shut his eyes to the State consideration" of the mixed question, *id.*, at 508. These statements can be reconciled, of course, on the assumption that the habeas judge must review the state-court determination for reasonableness. But we need not attempt to defend that conclusion in detail, for

In subsequent cases, we repeatedly reaffirmed *Brown*'s teaching that mixed constitutional questions are "open to review on collateral attack," *Cuyler* v. *Sullivan,* 446 U. S. 335, 342 (1980), without ever explicitly considering whether that "review" should be *de novo* or deferential. In some of these cases, we would have denied habeas relief even under *de novo* review, see, *e. g., Strickland* v. *Washington,* 466 U. S. 668, 698 (1984) (facts make it "clear" that habeas petitioner did not receive ineffective assistance of counsel); *Neil* v. *Biggers,* 409 U. S. 188, 201 (1972) (facts disclose "no substantial likelihood" that habeas petitioner was subjected to unreliable pretrial lineup); in others, we would have awarded habeas relief even under deferential review, see, *e. g., Brewer* v. *Williams,* 430 U. S. 387, 405 (1977) (facts provide "no reasonable basis" for finding valid waiver of right to counsel); *Irvin* v. *Dowd,* 366 U. S. 717, 725 (1961) (facts show "clear and convincing" evidence of biased jury); and in yet others, we remanded for application of a proper legal rule without addressing that standard of review question, see, *e. g., Cuyler, supra,* at 342, 350. Nonetheless, because these cases never qualified our early citation of *Brown* for the proposition that a federal habeas court *must* reexamine mixed constitutional questions "independently," *Townsend* v. *Sain,* 372 U. S. 293, 318 (1963) (dictum), we have gradually come to treat as settled the rule that mixed constitutional questions are "subject to plenary federal review" on habeas, *Miller* v. *Fenton,* 474 U. S. 104, 112 (1985).[6]

---

we conclude not that *Brown* v. *Allen* establishes deferential review for reasonableness, but only that *Brown* does not squarely foreclose it.

[6] We have no disagreement with JUSTICE O'CONNOR that *Brown* v. *Allen* quickly came to be cited for the proposition that a habeas court should review mixed questions "independently"; that several of our cases since *Brown* have applied a *de novo* standard with respect to pure and mixed legal questions; and that the *de novo* standard thus appeared well settled with respect to both categories by the time the Court decided *Miller* v. *Fenton* in 1985. See *post,* at 301–302. Despite her extended discussion of the leading cases from *Brown* through *Miller,* however, JUSTICE O'CON-

*Jackson* itself contributed to this trend. There, we held that a conviction violates due process if supported only by evidence from which "no rational trier of fact could find guilt beyond a reasonable doubt." 443 U. S., at 317. We stated explicitly that a state-court judgment applying the *Jackson* rule in a particular case "is of course entitled to deference" on federal habeas. *Id.*, at 323; see also *id.*, at 336, n. 9 (STEVENS, J., concurring in judgment) ("State judges are more familiar with the elements of state offenses than are federal judges and should be better able to evaluate sufficiency claims"). Notwithstanding these principles, however, we then indicated that the habeas court itself should apply the *Jackson* rule, see *id.*, at 324, rather than merely reviewing the state courts' application of it for reasonableness. Ultimately, though, we had no occasion to resolve our conflicting statements on the standard of review question, because we concluded that the habeas petitioner was not entitled to relief even under our own *de novo* application of *Jackson*. See *id.*, at 324–326.[7]

---

NOR offers nothing to refute those of our limited observations with which she evidently disagrees—that an unadorned citation to *Brown* should not have been enough, at least as an original matter, to establish *de novo* review with respect to mixed questions; and that in none of our leading cases was the choice between a *de novo* and a deferential standard outcome determinative.

[7] JUSTICE O'CONNOR asserts that *Jackson* "expressly rejected" a "deferential standard of review" that she characterizes as "very much like the one" urged on us by petitioners. *Post*, at 303 (citing 443 U. S., at 323). What *Jackson* expressly rejected, however, was a proposal that habeas review "should be foreclosed" if the state courts provide "appellate review of the sufficiency of the evidence." *Ibid.* That rule, of course, would permit *no* habeas review of a state-court sufficiency determination. As we understand it, however, petitioners' proposal would permit limited review for reasonableness, a standard surely consistent with our own statement that that state-court determination "is of course entitled to deference." *Ibid.* We agree with JUSTICE O'CONNOR that *Jackson* itself applied a *de novo* standard. See *post*, at 303. Nonetheless, given our statement

Despite our apparent adherence to a standard of *de novo* habeas review with respect to mixed constitutional questions, we have implicitly questioned that standard, at least with respect to pure legal questions, in our recent retroactivity precedents. In *Penry* v. *Lynaugh*, 492 U. S. 302, 313–314 (1989), a majority of this Court endorsed the retroactivity analysis advanced by JUSTICE O'CONNOR for a plurality in *Teague* v. *Lane*, 489 U. S. 288 (1989). Under *Teague*, a habeas petitioner generally cannot benefit from a new rule of criminal procedure announced after his conviction has become final on direct appeal. See *id.*, at 305–310 (opinion of O'CONNOR, J.). *Teague* defined a "new" rule as one that was "not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.*, at 301 (emphasis in original). In *Butler* v. *McKellar*, 494 U. S. 407, 415 (1990), we explained that the definition includes all rules "susceptible to debate among reasonable minds." Thus, if a state court has reasonably rejected the legal claim asserted by a habeas petitioner under existing law, then the claim seeks the benefit of a "new" rule under *Butler*, and is therefore not cognizable on habeas under *Teague*. In other words, a federal habeas court "must defer to the state court's decision rejecting the claim unless that decision is patently unreasonable." *Butler, supra*, at 422 (Brennan, J., dissenting).[8]

---

expressly endorsing a notion of at least limited deference, and given that the *Jackson* petitioner would have lost under either a *de novo* standard or a reasonableness standard, we cannot agree that the case "expressly rejected" the latter. *Post*, at 303.

[8] JUSTICE O'CONNOR suggests that *Teague* and its progeny "did not establish a standard of review at all." *Post*, at 303–304. Instead, she contends, these cases merely prohibit the retroactive application of new rules on habeas, *ibid.*, and establish the criterion for distinguishing new rules from old ones, *ibid.* We have no difficulty with describing *Teague* as a case about retroactivity, rather than standards of review, although we do not dispute JUSTICE O'CONNOR's suggestion that the difference, at least in practice, might well be "only 'a matter of phrasing.'" *Post*, at 304 (cita-

*Teague* was premised on the view that retroactivity questions in habeas corpus proceedings must take account of the nature and function of the writ, which we described as " 'a *collateral* remedy . . . not designed as a substitute for direct review.'" 489 U. S., at 306 (opinion of O'CONNOR, J.) (quoting *Mackey* v. *United States,* 401 U. S. 667, 682–683 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)) (emphasis in *Mackey*).   JUSTICE STEVENS reasoned similarly in *Jackson,* where he stressed that habeas corpus "is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials," but only "to guard against extreme malfunctions in the state criminal justice systems." 443 U. S., at 332, n. 5 (opinion concurring in judgment); see also *Greer* v. *Miller,* 483 U. S. 756, 768–769 (1987) (STEVENS, J., concurring in judgment).   Indeed, the notion that different standards should apply on direct and collateral review runs throughout our recent habeas jurisprudence.   We have said, for example, that new rules always have retroactive application to

_____

tion omitted).   We do disagree, however, with JUSTICE O'CONNOR's definition of what constitutes a "new rule" for *Teague* purposes.   A rule is new, she contends, if it "can be meaningfully distinguished from that established by binding precedent at the time [the] state court conviction became final." *Post,* at 304.   This definition leads her to suggest that a habeas court must determine whether the state courts have interpreted old precedents "properly." *Post,* at 305.   Our precedents, however, require a different standard.   We have held that a rule is "new" for *Teague* purposes whenever its validity under existing precedents is subject to debate among "reasonable minds," *Butler,* 494 U. S., at 415, or among "reasonable jurists," *Sawyer* v. *Smith,* 497 U. S. 227, 234 (1990).   Indeed, each of our last four relevant precedents has indicated that *Teague* insulates on habeas review the state courts' " 'reasonable, good-faith interpretations of existing precedents.'" *Ibid.* (quoting *Butler, supra,* at 414); *Saffle* v. *Parks,* 494 U. S. 484, 488 (1990) (citing *Butler*); see *Stringer* v. *Black,* 503 U. S. 222, 237 (1992) ("The purpose of the new rule doctrine is to validate reasonable interpretations of existing precedents").   Thus, *Teague* bars habeas relief whenever the state courts have interpreted old precedents *reasonably,* not only when they have done so "properly." *Post,* at 305.

criminal cases pending on direct review, see *Griffith* v. *Kentucky*, 479 U. S. 314, 320–328 (1987), but that they generally do not have retroactive application to criminal cases pending on habeas, see *Teague, supra,* at 305–310 (opinion of O'CONNOR, J.). We have held that the Constitution guarantees the right to counsel on a first direct appeal, see, *e. g., Douglas* v. *California,* 372 U. S. 353, 355–358 (1963), but that it guarantees no right to counsel on habeas, see, *e. g., Pennsylvania* v. *Finley,* 481 U. S. 551, 555 (1987). On direct review, we have announced and enforced the rule that state courts must exclude evidence obtained in violation of the Fourth Amendment. See, *e. g., Mapp* v. *Ohio,* 367 U. S. 643, 654–660 (1961). We have also held, however, that claims under *Mapp* are not cognizable on habeas as long as the state courts have provided a full and fair opportunity to litigate them at trial or on direct review. See *Stone* v. *Powell,* 428 U. S. 465, 489–496 (1976).

These differences simply reflect the fact that habeas review "entails significant costs." *Engle* v. *Isaac,* 456 U. S. 107, 126 (1982). Among other things, " '[i]t disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.' " *Duckworth* v. *Eagan,* 492 U. S. 195, 210 (1989) (O'CONNOR, J., concurring) (quoting *Harris* v. *Reed,* 489 U. S. 255, 282 (1989) (KENNEDY, J., dissenting)). In various contexts, we have emphasized that these costs, as well as the countervailing benefits, must be taken into consideration in defining the scope of the writ. See, *e. g., Coleman* v. *Thompson,* 501 U. S. 722, 738–739 (1991) (procedural default); *McCleskey* v. *Zant,* 499 U. S. 467, 490–493 (1991) (abuse of the writ); *Teague, supra,* at 308–310 (opinion of O'CONNOR, J.) (retroactivity); *Kuhlmann* v. *Wilson,* 477 U. S., at 444–455 (opinion of Powell, J.) (successive petitions); *Stone* v. *Powell, supra,* at 491–492, n. 31 (cognizability of particular claims).

In light of these principles, petitioners ask that we reconsider our statement in *Miller* v. *Fenton* that mixed constitutional questions are "subject to plenary federal review" on habeas, 474 U. S., at 112. By its terms, *Teague* itself is not directly controlling, because West sought federal habeas relief under *Jackson*, which was decided a year before his conviction became final on direct review. Nonetheless, petitioners contend, the logic of *Teague* makes our statement in *Miller* untenable. Petitioners argue that if deferential review for reasonableness strikes an appropriate balance with respect to purely legal claims, then it must strike an appropriate balance with respect to mixed questions as well. Moreover, they note that under the habeas statute itself, a state-court determination of a purely factual question must be "presumed correct," and can be overcome only by "convincing evidence," unless one of eight statutorily enumerated exceptions is present. 28 U. S. C. § 2254(d). It makes no sense, petitioners assert, for a habeas court generally to review factual determinations and legal determinations deferentially, but to review applications of law to fact *de novo*. Finally, petitioners find the prospect of deferential review for mixed questions at least implicit in our recent statement that *Teague* concerns are fully implicated "by the *application* of an old rule in a manner that was not dictated by precedent." *Stringer* v. *Black*, 503 U. S. 222, 228 (1992) (emphasis added). For these reasons, petitioners invite us to reaffirm that a habeas judge need not—and indeed may not—"shut his eyes" entirely to state-court applications of law to fact. *Brown* v. *Allen*, 344 U. S., at 508 (opinion of Frankfurter, J.). West develops two principal counterarguments: first, that Congress implicitly codified a *de novo* standard with respect to mixed constitutional questions when it amended the habeas statute in 1966; and second, that

*de novo* federal review is necessary to vindicate federal constitutional rights.[9]

We need not decide such far-reaching issues in this case. As in both *Brown* and *Jackson*, the claim advanced by the habeas petitioner must fail even assuming that the state court's rejection of it should be reconsidered *de novo*. Whatever the appropriate standard of review, we conclude that there was more than enough evidence to support West's conviction.

The case against West was strong. Two to four weeks after the Cardova home had been burglarized, over 15 of the items stolen were recovered from West's home. On direct examination at trial, West said nothing more than that he frequently bought and sold items at different flea markets. He failed to offer specific information about how he had come to acquire any of the stolen items, and he did not even mention Ronnie Elkins by name. When pressed on cross-examination about the details of his purchases, West contradicted himself repeatedly about where he supposedly had bought the stolen goods, and he gave vague, seemingly eva-

---

[9] JUSTICE O'CONNOR criticizes our failure to highlight in text the fact that Congress has considered, but failed to enact, several bills introduced during the last 25 years to prohibit *de novo* review explicitly. See *post*, at 305; see also Brief for Senator Biden et al. as *Amici Curiae* 10–16 (discussing various proposals). Our task, however, is not to construe bills that Congress has failed to enact, but to construe statutes that Congress has enacted. The habeas corpus statute was last amended in 1966. See 80 Stat. 1104–1105. We have grave doubts that post-1966 legislative history is of any value in construing its provisions, for we have often observed that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 117 (1980), quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960). Compare also *Sullivan* v. *Finkelstein*, 496 U. S. 617, 628, n. 8 (1990) (acknowledging "all the usual difficulties inherent in relying on subsequent legislative history"), with *id.*, at 632 (SCALIA, J., concurring in part) ("Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously").

sive answers to various other questions. See n. 1, *supra.* He said further that he could not remember how he had acquired such major household items as a television set and a coffee table, and he failed to offer any explanation whatsoever about how he had acquired Cardova's record player, among other things. Moreover, he testified that he had acquired Cardova's second television set from a seller other than Elkins (who remained unidentified) in an entirely unrelated (but roughly contemporaneous) transaction. Finally, he failed to produce any other supporting evidence, such as testimony from Elkins, whom he claimed to have known for years and done business with on a regular basis.

As the trier of fact, the jury was entitled to disbelieve West's uncorroborated and confused testimony. In evaluating that testimony, moreover, the jury was entitled to discount West's credibility on account of his prior felony conviction, see Va. Code Ann. § 19.2–269 (1990); *Sadoski* v. *Commonwealth,* 219 Va. 1069, 254 S. E. 2d 100 (1979), and to take into account West's demeanor when testifying, which neither the Court of Appeals nor we may review. And if the jury did disbelieve West, it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt, see, *e. g., Wilson* v. *United States,* 162 U. S. 613, 620–621 (1896); *United States* v. *Zafiro,* 945 F. 2d 881, 888 (CA7 1991) (Posner, J.), cert. granted on other grounds, 503 U. S. 935 (1992); *Dyer* v. *MacDougall,* 201 F. 2d 265, 269 (CA2 1952) (L. Hand, J.).

In *Jackson,* we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review. We said that "*all of the evidence* is to be considered in the light most favorable to the prosecution," 443 U. S., at 319 (emphasis in original); that the prosecution need not affirmatively "rule out every hypothesis except that of guilt," *id.,* at 326; and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if

it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," *ibid.* Under these standards, we think it clear that the trial record contained sufficient evidence to support West's conviction.

Having granted relief on West's *Jackson* claim, the Court of Appeals declined to address West's additional claim that he was entitled to a new trial, as a matter of due process, on the basis of newly discovered evidence. See 931 F. 2d, at 271, n. 9. As that claim is not properly before us, we decline to address it here. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

*Jackson* v. *Virginia,* 443 U. S. 307 (1979), required the federal courts to deny the requested writ of habeas corpus if, under the *Jackson* standard, there was sufficient evidence to support West's conviction, which, as the principal opinion amply demonstrates, see *ante,* at 295–296 and this page, there certainly was.

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, concurring in the judgment.

I agree that the evidence sufficiently supported respondent's conviction. I write separately only to express disagreement with certain statements in JUSTICE THOMAS' extended discussion, *ante,* at 285–295, of this Court's habeas corpus jurisprudence.

First, JUSTICE THOMAS errs in describing the pre-1953 law of habeas corpus. *Ante,* at 285. While it is true that a state prisoner could not obtain the writ if he had been provided a full and fair hearing in the state courts, this rule governed the merits of a claim under the Due Process Clause. It was not a threshold bar to the consideration of

*other* federal claims, because, with rare exceptions, there *were* no other federal claims available at the time. During the period JUSTICE THOMAS discusses, the guarantees of the Bill of Rights were not yet understood to apply in state criminal prosecutions. The only protections the Constitution afforded to state prisoners were those for which the text of the Constitution explicitly limited the authority of the States, most notably the Due Process Clause of the Fourteenth Amendment. And in the area of criminal procedure, the Due Process Clause was understood to guarantee no more than a full and fair hearing in the state courts. See, *e. g., Ponzi* v. *Fessenden,* 258 U. S. 254, 260 (1922) ("One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that").

Thus, when the Court stated that a state prisoner who had been afforded a full and fair hearing could not obtain a writ of habeas corpus, the Court was propounding a rule of constitutional law, not a threshold requirement of habeas corpus. This is evident from the fact that the Court did not just apply this rule on habeas, but also in cases on direct review. See, *e. g., Snyder* v. *Massachusetts,* 291 U. S. 97, 107–108 (1934) ("[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only"); *Twining* v. *New Jersey,* 211 U. S. 78, 110–111 (1908) ("Due process requires that the court which assumes to determine the rights of parties shall have jurisdiction, and that there shall be notice and opportunity for hearing given the parties. Subject to these two fundamental conditions, . . . this court has up to this time sustained all state laws, statutory or judicially declared, regulating procedure, evidence and methods of trial, and held them to be consistent with due process of law") (citations omitted). As long as a state criminal prosecution was fairly conducted by a court of competent jurisdiction according to state law, no constitutional question was presented, whether

on direct *or* habeas review. *Caldwell* v. *Texas,* 137 U. S. 692, 698 (1891); *Brown* v. *New Jersey,* 175 U. S. 172, 175 (1899).

The cases cited by JUSTICE THOMAS—*Moore* v. *Dempsey,* 261 U. S. 86 (1923), and *Frank* v. *Mangum,* 237 U. S. 309 (1915)—demonstrate that the absence of a full and fair hearing in the state courts was *itself* the relevant violation of the Constitution; it was not a prerequisite to a federal court's consideration of some other federal claim. Both cases held that a trial dominated by an angry mob was inconsistent with due process. In both, the Court recognized that the State could nevertheless afford due process if the state appellate courts provided a fair opportunity to correct the error. The state courts had provided such an opportunity in *Frank;* in *Moore,* they had not. In neither case is the "full and fair hearing" rule cited as a deferential standard of review applicable to habeas cases; the rule instead defines the constitutional claim itself, which was reviewed *de novo.* See *Moore, supra,* at 91–92.

Second, JUSTICE THOMAS quotes Justice Powell's opinion in *Kuhlmann* v. *Wilson,* 477 U. S. 436 (1986), out of context. *Ante,* at 285–286. Justice Powell said only that the judgment of a committing court of competent jurisdiction was accorded "absolute respect" on habeas in the 19th century, when the habeas inquiry was limited to the jurisdiction of the court. *Kuhlmann, supra,* at 446 (opinion of Powell, J.). Justice Powell was not expressing the erroneous view which JUSTICE THOMAS today ascribes to him, that state court judgments were entitled to complete deference before 1953.

Third, JUSTICE THOMAS errs in implying that *Brown* v. *Allen,* 344 U. S. 443 (1953), was the first case in which the Court held that the doctrine of res judicata is not strictly followed on federal habeas. *Ante,* at 287. In fact, the Court explicitly reached this holding for the first time in *Salinger* v. *Loisel,* 265 U. S. 224, 230 (1924). Even *Salinger* did not break new ground: The *Salinger* Court observed that such had been the rule at common law, and that the Court had

implicitly followed it in *Carter* v. *McClaughry*, 183 U. S. 365, 378 (1902), and *Ex parte Spencer*, 228 U. S. 652, 658 (1913). *Salinger, supra,* at 230. The Court reached the same conclusion in at least two other cases between *Salinger* and *Brown.* See *Waley* v. *Johnston*, 316 U. S. 101, 105 (1942); *Darr* v. *Burford*, 339 U. S. 200, 214 (1950). *Darr* and *Spencer*, like this case, involved the initial federal habeas filings of state prisoners.

Fourth, JUSTICE THOMAS understates the certainty with which *Brown* v. *Allen* rejected a deferential standard of review of issues of law. *Ante,* at 287–288. The passages in which the *Brown* Court stated that a district court should determine whether the state adjudication had resulted in a "satisfactory conclusion," and that the federal courts had discretion to give some weight to state court determinations, *ante,* at 287, were passages in which the Court was discussing how federal courts should resolve questions of *fact*, not issues of law. This becomes apparent from a reading of the relevant section of *Brown*, 344 U. S., at 460–465, a section entitled "Right to a Plenary Hearing." When the Court then turned to the primary *legal* question presented—whether the Fourteenth Amendment permitted the restriction of jury service to taxpayers—the Court answered that question in the affirmative without any hint of deference to the state courts. *Id.,* at 467–474. The proper standard of review of issues of law was also discussed in Justice Frankfurter's opinion, which a majority of the Court endorsed. After recognizing that state court factfinding need not always be repeated in federal court, Justice Frankfurter turned to the quite different question of determining the law. He wrote: "Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts, *the District Judge must exercise his own judgment* on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication

with the federal judge." *Id.*, at 507 (emphasis added; citation omitted). Justice Frankfurter concluded: "The State court cannot have the last say when it, though on fair consideration and what procedurally may be deemed fairness, may have misconceived a federal constitutional right." *Id.*, at 508.

Fifth, JUSTICE THOMAS incorrectly states that we have never considered the standard of review to apply to mixed questions of law and fact raised on federal habeas. *Ante*, at 289. On the contrary, we did so in the very cases cited by JUSTICE THOMAS. In *Irvin* v. *Dowd*, 366 U. S. 717 (1961), we stated quite clearly that " 'mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' It was, therefore, the duty of the Court of Appeals to independently evaluate [the issue of jury prejudice]." *Id.*, at 723 (quoting *Brown* v. *Allen, supra*, at 507 (opinion of Frankfurter, J.)). We then proceeded to employ precisely the same legal analysis as in cases on direct appeal. 366 U. S., at 723–728.

In *Townsend* v. *Sain*, 372 U. S. 293 (1963), we again said that "[a]lthough the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently." *Id.*, at 318.

In *Neil* v. *Biggers*, 409 U. S. 188 (1972), we addressed *de novo* the question whether the state court pretrial identification procedures were unconstitutionally suggestive by using the same standard used in cases on direct appeal: " 'a very substantial likelihood of irreparable misidentification.' " *Id.*, at 198 (quoting *Simmons* v. *United States*, 390 U. S. 377, 384 (1968)).

In *Brewer* v. *Williams*, 430 U. S. 387 (1977), we reviewed *de novo* a state court's finding that a defendant had waived his right to counsel. We held that "the question of waiver

was not a question of historical fact, but one which, in the words of Mr. Justice Frankfurter, requires 'application of constitutional principles to the facts as found . . . .'" *Id.*, at 403 (quoting *Brown* v. *Allen, supra,* at 507 (opinion of Frankfurter, J.)). We then employed the same legal analysis used on direct review. 430 U. S., at 404.

In *Cuyler* v. *Sullivan,* 446 U. S. 335 (1980), we explicitly considered the question whether the Court of Appeals had exceeded the proper scope of review of the state court's decision. *Id.,* at 341. We concluded that because the issue presented was not one of historical fact entitled to a presumption of correctness under 28 U. S. C. § 2254(d), the Court of Appeals was correct in reconsidering the state court's "application of legal principles to the historical facts of this case." 446 U. S., at 342. Although we held that the Court of Appeals had erred in stating the proper legal principle, we remanded to have it consider the case under the same legal principles as in cases on direct review. *Id.,* at 345–350.

In *Strickland* v. *Washington,* 466 U. S. 668 (1984), we held that "[t]he principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. . . . [N]o special standards ought to apply to ineffectiveness claims made in habeas proceedings." *Id.,* at 697–698. We distinguished state court determinations of mixed questions of fact and law, to which federal courts should not defer, from state court findings of historical fact, to which federal courts should defer. *Id.,* at 698.

Finally, in *Miller* v. *Fenton,* 474 U. S. 104 (1985), we recognized that "an unbroken line of cases, coming to this Court both on direct appeal and on review of applications to lower federal courts for a writ of habeas corpus, forecloses the Court of Appeals' conclusion that the 'voluntariness' of a confession merits something less than independent federal consideration." *Id.,* at 112.

To this list of cases cited by JUSTICE THOMAS, one could add the following, all of which applied a standard of *de novo* review. *Leyra* v. *Denno,* 347 U. S. 556, 558–561 (1954); *United States ex rel. Jennings* v. *Ragen,* 358 U. S. 276, 277 (1959); *Rogers* v. *Richmond,* 365 U. S. 534, 546 (1961); *Gideon* v. *Wainwright,* 372 U. S. 335, 339–345 (1963); *Pate* v. *Robinson,* 383 U. S. 375, 384–386 (1966); *Sheppard* v. *Maxwell,* 384 U. S. 333, 349–363 (1966); *McMann* v. *Richardson,* 397 U. S. 759, 766–774 (1970); *Lego* v. *Twomey,* 404 U. S. 477, 482–490 (1972); *Barker* v. *Wingo,* 407 U. S. 514, 522–536 (1972); *Morrissey* v. *Brewer,* 408 U. S. 471, 480–490 (1972); *Gagnon* v. *Scarpelli,* 411 U. S. 778, 781–791 (1973); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 222–249 (1973); *Manson* v. *Brathwaite,* 432 U. S. 98, 109–117 (1977); *Watkins* v. *Sowders,* 449 U. S. 341, 345–349 (1981); *Jones* v. *Barnes,* 463 U. S. 745, 750–754 (1983); *Berkemer* v. *McCarty,* 468 U. S. 420, 435–442 (1984); *Moran* v. *Burbine,* 475 U. S. 412, 420–434 (1986); *Kimmelman* v. *Morrison,* 477 U. S. 365, 383–387 (1986); *Maynard* v. *Cartwright,* 486 U. S. 356, 360–365 (1988); *Duckworth* v. *Eagan,* 492 U. S. 195, 201–205 (1989). There have been many others.

Sixth, JUSTICE THOMAS misdescribes *Jackson* v. *Virginia,* 443 U. S. 307 (1979). *Ante,* at 290. In *Jackson,* the respondents proposed a deferential standard of review, very much like the one JUSTICE THOMAS discusses today, that they thought appropriate for addressing constitutional claims of insufficient evidence. 443 U. S., at 323. We expressly rejected this proposal. *Ibid.* Instead, we adhered to the general rule of *de novo* review of constitutional claims on habeas. *Id.,* at 324.

Seventh, JUSTICE THOMAS mischaracterizes *Teague* v. *Lane,* 489 U. S. 288 (1989), and *Penry* v. *Lynaugh,* 492 U. S. 302 (1989), as "question[ing] th[e] standard [of *de novo* review] with respect to pure legal questions." *Ante,* at 291. *Teague* did not establish a "deferential" standard of review of state court determinations of federal law. It did not es-

tablish a standard of review at all. Instead, *Teague* simply requires that a state conviction on federal habeas be judged according to the law in existence when the conviction became final. *Penry, supra,* at 314; *Teague, supra,* at 301. In *Teague,* we refused to give state prisoners the retroactive benefit of new rules of law, but we did *not* create any deferential standard of review with regard to old rules.

To determine what counts as a new rule, *Teague* requires courts to ask whether the rule a habeas petitioner seeks can be meaningfully distinguished from that established by binding precedent at the time his state court conviction became final. Cf. *Mackey* v. *United States,* 401 U. S. 667, 695 (1971) (inquiry is "to determine whether a particular decision has really announced a 'new' rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is *closely analogous to those which have been previously considered* in the prior case law") (Harlan, J., concurring in judgments in part and dissenting in part) (internal quotation marks omitted; emphasis added). Even though we have characterized the new rule inquiry as whether "reasonable jurists" could disagree as to whether a result is dictated by precedent, see *Sawyer* v. *Smith,* 497 U. S. 227, 234 (1990), the standard for determining when a case establishes a new rule is "objective," and the mere existence of conflicting authority does not necessarily mean a rule is new. *Stringer* v. *Black,* 503 U. S. 222, 237 (1992). If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful, and any deviation from precedent is not reasonable.

So, while JUSTICE THOMAS says that we "defer" to state courts' determinations of federal law, the statement is misleading. Although in practice, it may seem only "a matter of phrasing" whether one calls the *Teague* inquiry a standard of review or not, "phrasing mirrors thought, [and] it is impor-

tant that the phrasing not obscure the true issue before a federal court." *Brown* v. *Allen*, 344 U. S., at 501 (opinion of Frankfurter, J.). As JUSTICE KENNEDY convincingly demonstrates, the duty of the federal court in evaluating whether a rule is "new" is not the same as deference; federal courts must make an independent evaluation of the precedent existing at the time the state conviction became final in order to determine whether the case under consideration is meaningfully distinguishable. *Teague* does not direct federal courts to spend less time or effort scrutinizing the existing federal law, on the ground that they can assume the state courts interpreted it properly.

Eighth, though JUSTICE THOMAS suggests otherwise, *ante*, at 293, *de novo* review is not incompatible with the maxim that federal courts should "give great weight to the considered conclusions of a coequal state judiciary," *Miller* v. *Fenton*, 474 U. S., at 112, just as they do to persuasive, well-reasoned authority from district or circuit courts in other jurisdictions. A state court opinion concerning the legal implications of precisely the same set of facts is the closest one can get to a "case on point," and is especially valuable for that reason. But this does not mean that we have held in the past that federal courts must presume the correctness of a state court's legal conclusions on habeas, or that a state court's incorrect legal determination has ever been allowed to stand because it was reasonable.. We have always held that federal courts, even on habeas, have an independent obligation to say what the law is.

Finally, in his one-sentence summary of respondent's arguments, *ante*, at 294, JUSTICE THOMAS fails to mention that Congress has considered habeas corpus legislation during 27 of the past 37 years, and on 13 occasions has considered adopting a deferential standard of review along the lines suggested by JUSTICE THOMAS. Congress has rejected each proposal. In light of the case law and Congress' position, a move away from *de novo* review of mixed questions of law

and fact would be a substantial change in our construction of the authority conferred by the habeas corpus statute. As JUSTICE THOMAS acknowledges, to change the standard of review would indeed be "far-reaching," *ante*, at 295, and we need not decide whether to do so in order to resolve this case.

JUSTICE KENNEDY, concurring in the judgment.

I do not enter the debate about the reasons that took us to the point where mixed constitutional questions are subject to *de novo* review in federal habeas corpus proceedings. Whatever the answer to that difficult historical inquiry, all agree that, at least prior to the Court's adoption of the retroactivity analysis of *Teague* v. *Lane,* 489 U. S. 288 (1989), see *Penry* v. *Lynaugh,* 492 U. S. 302, 313–314 (1989), the matter was settled. It seems that the real issue dividing my colleagues is whether the retroactivity analysis of *Teague* casts doubt upon the rule of *Miller* v. *Fenton,* 474 U. S. 104, 112 (1985). Even petitioner State of Virginia and the United States as *amicus curiae,* both seeking a deferential standard with respect to mixed questions, recognize that this is how the standard of review question arises. See Brief for Petitioners 11 ("The notion that a state prisoner has a right to *de novo* federal collateral review of his constitutional claims . . . surely has not survived this Court's decisions in *Teague*" and its progeny); Brief for United States as *Amicus Curiae* 12 ("Prior to the rule established by *Teague* [and later cases applying *Teague*], this Court often treated mixed questions of law and fact as subject to independent review in federal habeas corpus").

If vindication of the principles underlying *Teague* did require that state-court rulings on mixed questions must be given deference in a federal habeas proceeding, then indeed it might be said that the *Teague* line of cases is on a collision course with the *Miller* v. *Fenton* line. And in the proper case we would have to select one at the expense of the other. But in my view neither the purpose for which *Teague* was

adopted nor the necessary means for implementing its hold-
ing creates any real conflict with the requirement of *de novo*
review of mixed questions.

In my view, it would be a misreading of *Teague* to inter-
pret it as resting on the necessity to defer to state-court de-
terminations.   *Teague* did not establish a deferential stand-
ard of review of state-court decisions of federal law.   It
established instead a principle of retroactivity.   See *Teague*
v. *Lane, supra,* at 310 ("[W]e now adopt Justice Harlan's
view of retroactivity for cases on collateral review").   To be
sure, the fact that our standard for distinguishing old rules
from new ones turns on the reasonableness of a state court's
interpretation of then existing precedents suggests that fed-
eral courts do in one sense defer to state-court determina-
tions.   But we should not lose sight of the purpose of the
reasonableness inquiry where a *Teague* issue is raised: The
purpose is to determine whether application of a new rule
would upset a conviction that was obtained in accordance
with the constitutional interpretations existing at the time
of the prisoner's conviction.

As we explained earlier this Term:

> "When a petitioner seeks federal habeas relief based
> upon a principle announced after a final judgment,
> *Teague* and our subsequent decisions interpreting it re-
> quire a federal court to answer an initial question, and
> in some cases a second.   First, it must be determined
> whether the decision relied upon announced a new rule.
> If the answer is yes and neither exception applies, the
> decision is not available to the petitioner.   If, however,
> the decision did not announce a new rule, it is necessary
> to inquire whether granting the relief sought would cre-
> ate a new rule because the prior decision is applied in
> a novel setting, thereby extending the precedent.   The
> interests in finality, predictability, and comity underly-
> ing our new rule jurisprudence may be undermined to
> an equal degree by the invocation of a rule that was not

dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent." *Stringer* v. *Black,* 503 U. S. 222, 227–228 (1992) (citation omitted).

The comity interest is not, however, in saying that since the question is close the state-court decision ought to be deemed correct because we are in no better position to judge. That would be the real thrust of a principle based on deference. We see that principle at work in the statutory requirement that, except in limited circumstances, the federal habeas court must presume the correctness of state-court factual findings. See 28 U. S. C. § 2254(d). See also *Rushen* v. *Spain,* 464 U. S. 114, 120 (1983) *(per curiam)* (noting that "the state courts were in a far better position than the federal courts to answer" a factual question). Deference of this kind may be termed a comity interest, but it is not the comity interest that underlies *Teague.* The comity interest served by *Teague* is in not subjecting the States to a regime in which finality is undermined by our changing a rule once thought correct but now understood to be deficient on its own terms. It is in recognition of this principle that we ask whether the decision in question was dictated by precedent. See, *e. g., Saffle* v. *Parks,* 494 U. S. 484, 488 (1990).

*Teague* does bear on applications of law to fact which result in the announcement of a new rule. Whether the prisoner seeks the application of an old rule in a novel setting, see *Stringer, supra,* at 228, depends in large part on the nature of the rule. If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule. The rule of *Jackson* v. *Virginia,* 443 U. S. 307 (1979), is an example. By its very terms it provides a general standard which calls for some examination of the facts. The standard is whether any rational trier of fact could have found guilt beyond a reasonable doubt after a review of all

the evidence, so of course there will be variations from case to case. Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.

Although as a general matter "new rules will not be applied or announced" in habeas proceedings, *Penry*, 492 U. S., at 313, there is no requirement that we engage in the threshold *Teague* inquiry in a case in which it is clear that the prisoner would not be entitled to the relief he seeks even if his case were pending on direct review. See *Collins* v. *Youngblood*, 497 U. S. 37 (1990). Therefore, it is not necessary to the resolution of this case to consider the oddity that reversing respondent's conviction because of the quite fact-specific determination that there was insufficient evidence would have the arguable effect of undercutting the well-established general principle in Virginia and elsewhere that the trier of fact may infer theft from unexplained or falsely denied possession of recently stolen goods. Whether a holding that there was insufficient evidence would constitute one of those unusual cases in which an application of *Jackson* would create a new rule need not be addressed.

On these premises, the existence of *Teague* provides added justification for retaining *de novo* review, not a reason to abandon it. *Teague* gives substantial assurance that habeas proceedings will not use a new rule to upset a state conviction that conformed to rules then existing. With this safeguard in place, recognizing the importance of finality, *de novo* review can be exercised within its proper sphere.

For the foregoing reasons, I would not interpret *Teague* as calling into question the settled principle that mixed questions are subject to plenary review on federal habeas corpus. And, for the reasons I have mentioned, I do not think it necessary to consider whether the respondent brings one of those unusual *Jackson* claims which is *Teague*-barred.

I agree that the evidence in this case was sufficient to convince a rational factfinder of guilt beyond a reasonable doubt; and I concur in the judgment of the Court.

JUSTICE SOUTER, concurring in the judgment.

While I could not disagree with the majority that sufficient evidence supported West's conviction, see, *e. g., ante*, at 295–297, I do not think the Court should reach that issue. We have often said that when the principles first developed in *Teague* v. *Lane*, 489 U. S. 288 (1989), pose a threshold question on federal habeas review, it is only after an answer favorable to the prisoner that a court should address the merits. See, *e. g., Collins* v. *Youngblood*, 497 U. S. 37, 40–41 (1990); *Penry* v. *Lynaugh*, 492 U. S. 302, 313, 329 (1989); *Teague, supra*, at 300 (plurality opinion). This habeas case begins with a *Teague* question, and its answer does not favor West. I would go no further.[1]

I

Under cases in the line of *Teague* v. *Lane, supra*, with two narrow exceptions not here relevant, federal courts conducting collateral review may not announce or apply a "new" rule for a state prisoner's benefit, *Butler* v. *McKellar*, 494 U. S. 407, 412 (1990); *Teague, supra*, at 310 (plurality opinion), a new rule being one that was "not '*dictated* by precedent existing at the time the defendant's conviction became final,'" *Sawyer* v. *Smith*, 497 U. S. 227, 234 (1990) (quoting *Teague, supra*, at 301 (plurality opinion)) (emphasis in original). Put differently, the new-rule enquiry asks "whether a state court considering [the prisoner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [the prisoner] seeks was required by the Constitution." *Saffle* v. *Parks*, 494 U. S. 484, 488

---

[1] Because my analysis ends the case for me without reaching historical questions, I do not take a position in the disagreement between JUSTICE THOMAS and JUSTICE O'CONNOR.

(1990). Or, put differently yet again, if "reasonable jurists [might have] disagree[d]" about the steps the law would take next, its later development will not be grounds for relief. *Sawyer* v. *Smith, supra,* at 234; see also *Butler, supra,* at 415 ("susceptible to debate among reasonable minds").

The *Teague* line of cases reflects recognition of important "interests of comity and finality." *Teague, supra,* at 308 (plurality opinion). One purpose of federal collateral review of judgments rendered by state courts in criminal cases is to create an incentive for state courts to " " "conduct their proceedings in a manner consistent with established constitutional standards," ' " *Butler, supra,* at 413 (quoting *Teague, supra,* at 306 (plurality opinion)), and "[t]he 'new rule' principle" recognizes that purpose by "validat[ing] reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler, supra,* at 414 (citing *United States* v. *Leon,* 468 U. S. 897, 918–919 (1984)).

The crux of the analysis when *Teague* is invoked, then, is identification of the rule on which the claim for habeas relief depends. To survive *Teague,* it must be "old" enough to have predated the finality of the prisoner's conviction, and specific enough to dictate the rule on which the conviction may be held to be unlawful. A rule old enough for *Teague* may of course be too general, and while identifying the required age of the rule of relief is a simple matter of comparing dates, passing on its requisite specificity calls for analytical care.

The proper response to a prisoner's invocation of a rule at too high a level of generality is well illustrated by our cases. In *Butler, supra,* for example, the prisoner relied on the rule of *Arizona* v. *Roberson,* 486 U. S. 675 (1988), which we announced after Butler's conviction had become final. We held in *Roberson* that the Fifth Amendment forbids police interrogation about a crime after the suspect requests counsel, even if his request occurs in the course of investigating a

different, unrelated crime. *Id.,* at 682. Butler argued that he could invoke *Roberson's* rule because it was "merely an application of *Edwards* [v. *Arizona,* 451 U. S. 477 (1981)]," in which we held that, if a person is in custody on suspicion of a crime, the police must stop questioning him about that crime once he invokes his right to counsel, *id.,* at 484–485, "to a slightly different set of facts." 494 U. S., at 414. We rejected this argument, saying that it "would not have been an illogical or even a grudging application of *Edwards* to decide that it did not extend to the facts of *Roberson." Id.,* at 415.

Likewise, in *Sawyer, supra,* the petitioner sought the benefit of *Caldwell* v. *Mississippi,* 472 U. S. 320 (1985), which had been announced after Sawyer's conviction was final. We held in *Caldwell* that the Eighth Amendment prohibits resting "a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.,* at 328–329. Sawyer argued that he was entitled to the benefit of *Caldwell's* rule as having been "dictated by the principle of reliability in capital sentencing," *Sawyer, supra,* at 236, which, he said, had been established by cases announced before his conviction became final, *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), and *Lockett* v. *Ohio,* 438 U. S. 586 (1978), among them. We rejected the argument, saying that

> "the *[Teague]* test would be meaningless if applied at this level of generality. Cf. *Anderson* v. *Creighton,* 483 U. S. 635, 639 (1987) ('[I]f the test of "clearly established law" were to be applied at this level of generality, . . . [p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights')." 497 U. S., at 236 (internal quotation brackets in original).

Although the principle that Sawyer invoked certainly "lent general support to the conclusion reached in *Caldwell*," *ibid.*, we said that " 'it does not follow that [*Eddings* and *Lockett*] compel the rule that [petitioner] seeks,' " *ibid.* (second set of brackets in original) (quoting *Saffle, supra*, at 491).

In sum, our cases have recognized that "[t]he interests in finality, predictability, and comity underlying our new rule jurisprudence may be undermined to an equal degree by the invocation of a rule that was not dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent." *Stringer* v. *Black*, 503 U. S. 222, 228 (1992). This does not mean, of course, that a habeas petitioner must be able to point to an old case decided on facts identical to the facts of his own. But it does mean that, in light of authority extant when his conviction became final, its unlawfulness must be apparent. Cf. *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987).

## II

In this case, the Court of Appeals overruled the Commonwealth's *Teague* objection by saying that West merely claimed that the evidence had been insufficient to support his conviction, so that the result he sought was dictated by *Jackson* v. *Virginia*, 443 U. S. 307 (1979), a case announced before petitioner's conviction became final for *Teague* purposes in 1980. 931 F. 2d 262, 265–267 (CA4 1991). Having thus surmounted *Teague*'s time hurdle, the court went on to say that "the evidence here consisted entirely of . . . the . . . facts . . . that about one-third in value of goods stolen between December 13 and December 26, 1978, were found on January 10, 1979, in the exclusive possession of . . . West, coupled with [West's] own testimony explaining his possession as having come about by purchases in the interval." 931 F. 2d, at 268. Applied in this context, the court held, the unadorned *Jackson* norm translated into the more specific rule announced in *Cosby* v. *Jones*, 682 F. 2d 1373 (CA11

1982), which held that the evidence of unexplained or unconvincingly explained possession of recently stolen goods was not, without more, sufficient to prove theft, but must be weighed more exactly after asking five questions: (1) Was "the possession . . . recent, relative to the crime"? (2) Was. a large majority of the stolen items found in the defendant's possession? (3) Did the defendant attempt to conceal the stolen items? (4) Was the defendant's explanation, "even if discredited by the jury, . . . 'so implausible or demonstrably false as to give rise to positive evidence in favor of the government'"? and (5) Was there corroborating evidence supporting the conviction? 931 F. 2d, at 268 (quoting *Cosby, supra,* at 1383, n. 19).

Applying *Cosby* to the facts of this case, the Court of Appeals found that all five factors were either neutral or advantageous to West: (1) Two to four weeks elapsed between the theft and the possession described in testimony,[2] a time period consistent with West's explanation that he had bought the goods in the interval; (2) measured by value, a mere third of Cardova's belongings surfaced in West's possession; (3) the stolen items were found in plain view in West's home; (4) while "there was no third person testimony corroborating [West's] explanation and on cross-examination West exhibited confusion about the exact circumstances of some of the purchases[,] . . . he maintained his general explanation that he had purchased all the items at flea markets, and there was nothing inherently implausible about this explanation"; and, finally, (5) there was no evidence corroborating theft by West. 931 F. 2d, at 269–270. The Court of Appeals concluded that "the evidence here, assessed in its entirety and in the light most favorable to the prosecution, was not sufficient to persuade any rational trier of fact of [West's] guilt . . . ." *Id.,* at 270.

---

[2] The Court of Appeals overlooked that West testified that he came into possession of Cardova's goods around January 1. See App. 25–27. Thus, a more accurate estimate of the time lapse would be one to three weeks.

It is clear that the Court of Appeals misapplied the commands of *Teague* by defining the rule from which West sought to benefit at an unduly elevated level of generality. There can, of course, be no doubt that, in reviewing West's conviction, the Supreme Court of Virginia was not entitled to disregard *Jackson*, which antedated the finality of West's conviction. But from *Jackson's* rule, that sufficiency depends on whether a rational trier, viewing the evidence most favorably to the prosecution, could find all elements beyond a reasonable doubt, it does not follow that the insufficiency of the evidence to support West's conviction was apparent. Virginia courts have long recognized a rule that evidence of unexplained or falsely explained possession of recently stolen goods is sufficient to sustain a finding that the possessor took the goods. See, *e. g., Montgomery* v. *Commonwealth,* 221 Va. 188, 190, 269 S. E. 2d 352, 353 (1980); *Henderson* v. *Commonwealth,* 215 Va. 811, 812–813, 213 S. E. 2d 782, 783–784 (1975); *Bazemore* v. *Commonwealth,* 210 Va. 351, 352, 170 S. E. 2d 774, 776 (1969); *Bright* v. *Commonwealth,* 4 Va. App. 248, 251, 356 S. E. 2d 443, 444 (1987). In this case, we are concerned only with the Virginia rule's second prong. West took the stand and gave an explanation that the jury rejected, thereby implying a finding that the explanation was false.[3] Thus, the portion of the state rule under attack here is that falsely explained recent possession suffices to identify the possessor as the thief. The rule has the virtue of much common sense. It is utterly reasonable to conclude that a possessor of recently stolen goods who lies about where he got them is the thief who took them, and it should come as no surprise that the rule had been accepted as good law against the backdrop of a general state sufficiency standard no less stringent than that of *Jackson.* See, *e. g., Bishop* v. *Commonwealth,* 227 Va. 164, 169, 313 S. E. 2d 390, 393 (1984);

---

[3] The jury's finding must of course be accepted under the *Jackson* v. *Virginia,* 443 U. S. 307 (1979), requirement to judge sufficiency by viewing the evidence "in the light most favorable to the prosecution." *Id.,* at 319.

*Inge* v. *Commonwealth,* 217 Va. 360, 366, 228 S. E. 2d 563, 568 (1976). It is simply insupportable, then, to say that reasonable jurists could not have considered this rule compatible with the *Jackson* standard. There can be no doubt, therefore, that in the federal courts West sought the benefit of a "new rule," and that his claim was barred by *Teague.*

On this ground, I respectfully concur in the judgment of the Court.