**David FINK, Petitioner;**

v.

**Marisela MONTES, Director of the California Parole Services Div., Respondent.**

**No. CV 96–8197 JSL(VAP).**

United States District Court, C.D. California.

March 23, 1999.

William P. Healy, Lomita, CA, for petitioner.

David Fink, Anaheim, CA, in pro per.

Kenneth N. Sokoler, Los Angeles, CA, for respondent.

## ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIM TWO

LETTS, District Judge.

Before the court are the parties' cross motions for summary judgment on Petitioner's second claim for violation of his Sixth Amendment right to counsel. The court finds there is no genuine issue as to claim two, grants Respondent's motion for summary judgment, and denies Petitioner's motion for summary judgment.

## I. *SUMMARY OF PROCEEDINGS*

Petitioner filed the instant Petition for Writ of Habeas Corpus on November 22, 1996.[1] Petitioner asserts over thirty grounds for habeas corpus relief. The summary judgment motion and cross-motion only address claim two, in which Petitioner asserts that his trial attorney violated his Sixth Amendment right to counsel by advising Petitioner's brother, William Gaynor, to cooperate with the prosecution's investigation of the crimes charged against Petitioner, and by advising Petitioner's mother, Joan Picha, not to testify at Petitioner's trial. [Petition at 35–39; Memorandum in Support of Petition at 7–11.]

---

1. Although Petitioner has not named his individual parole officer as an additional respondent, as called for by Rule 2, 28 foll. U.S.C. § 2254 advisory committee's note, this omission does not appear to affect the court's jurisdiction to adjudicate the Petition. *See Ortiz–Sandoval v. Gomez,* 81 F.3d 891, 895–96 (9th Cir.1996) (holding that the petitioner properly named the Director of the California Department of Corrections as respondent, as an alternative to naming the warden of the prison where he was incarcerated, since both officials had the authority to produce the petitioner in response to a court order).

Respondent filed a Return on April 4, 1997, contending that several of Petitioner's claims were unexhausted. Petitioner filed an "Opposition" to the Return on April 23, 1997. On May 19, 1997, the court issued an order concluding that Petitioner's claims had been exhausted and ordering Respondent to address the merits of Petitioner's claims.

Respondent filed a Supplemental Return on August 11, 1997. Petitioner filed a Traverse on September 8, 1997. On March 23, 1998, the court issued an order concluding that an evidentiary hearing was necessary to address the merits of claim two, and appointed counsel for Petitioner. In response to the court's order, Respondent filed a Second Supplemental Return on June 3, 1998.

On August 5, 1998, Petitioner filed a motion for summary judgment. On September 9, 1998, Respondent filed an opposition to Petitioner's motion, and a cross-motion for summary judgment. Petitioner filed a response on September 23, 1998, and Respondent filed a reply on October 15, 1998.

## II. BACKGROUND

Petitioner was charged with five counts of commercial burglary, each involving attempts to take money from safes located in fast food restaurants in Santa Barbara County. The trial was complex and protracted. The prosecution presented approximately eighty-four witnesses. The defense called five witnesses, including Petitioner, who testified in his own defense. The evidence presented at trial is briefly summarized as follows.

Petitioner was charged with the following five crimes: (1) burglary of the Santa Barbara McDonald's restaurant on January 21, 1992; (2) burglary of the Buellton Burger King restaurant on February 24, 1992;[2] (3) burglary of the Buellton McDonald's restaurant on February 26, 1992;

(4) a second burglary of the Buellton Burger King restaurant on March 2, 1992; and (5) burglary of. the Carpinteria Bob's Big Boy restaurant on March 3, 1992. [C.T. 1–5.]

Petitioner and his brother, William Gaynor, were arrested at the Buellton Motel 6 on March 16, 1992. [R.T. vol. III at 368–69, 409.] The police seized numerous tools from Petitioner's motel room, including: a Bosch high speed drill; a metal grappling hook with a nylon rope; a packet of lock picking tools; a walkie-talkie receiver and transmitter; an eighteen-inch pry bar; Lockmaster drill site templates; bolt cutters; and pliers. [R.T. vol. III at 369–81.]

A criminalist examined tools seized from Petitioner's motel room and determined that: (1) marks located on a broken lock clasp from the Bob's Big Boy roof hatch were made by a pair of bolt cutters seized from the motel room [R.T. vol. V at 706–09]; (2) marks found on a door lock at the Buellton McDonald's were made by a pair of channel lock pliers seized from the motel room [R.T. vol. V at 710–12]; and (3) marks made on a padlock found at the Buellton Burger King after the second burglary could have been made by bolt cutters seized from the motel room. [R.T. vol. V at 717–19.] The criminalist also prepared a cast of the door jamb of the Buellton Burger King office door to examine it for tool marks. [R.T. vol. V at 713–715.] He determined that tool marks on the door were made by a screwdriver seized from Petitioner's motel room. [R.T. vol. V at 712, 715–16.]

In addition to presenting evidence to show that Petitioner committed the charged crimes, the prosecution successfully moved to introduce evidence of fifteen other uncharged acts to prove Petitioner's identity as the perpetrator of the charged crimes. [R.T. vol. V at 728–33.]

---

2. Although the information alleged the crime occurred on February 23, 1992, the evidence at trial showed the date was February 24, 1992. [R.T. vol. III at 312.]

### *Testimony of William Gaynor*

Gaynor testified against Petitioner at trial. Gaynor stated that he entered into a plea agreement with the prosecutor, pursuant to which Gaynor pleaded guilty to three counts of commercial burglary and agreed to testify truthfully against Petitioner. [R.T. vol. IX at 1414–1416.] In exchange, the prosecutor agreed to dismiss the remaining two counts of commercial burglary, and to ask that Gaynor be sentenced to no more than one year in the county jail. [R.T. vol. IX at 1415.] The prosecutor also agreed to speak to the authorities in Ventura and Orange Counties and inform them of Gaynor's cooperation in the case against Petitioner. [R.T. vol. IX at 1416.]

Gaynor testified that in January 1992, Petitioner asked Gaynor if he would help Petitioner by acting as a lookout while Petitioner committed burglaries. [R.T. vol. IX at 1467–68.] Gaynor admitted that he participated in burglarizing the Santa Barbara McDonald's on January 21, 1992. [R.T. vol. IX at 1417–18.] Gaynor explained that he drove to McDonald's and dropped off Petitioner behind the restaurant. [R.T. vol. IX at 1422.] Gaynor communicated with Petitioner by walkie-talkie while Petitioner was inside the restaurant. [R.T. vol. IX at 1423–25.] At some point, Gaynor told Petitioner that someone was entering the restaurant. [R.T. vol. IX at 1425.] Petitioner exited the restaurant and returned to Gaynor's car. [R.T. vol. IX at 1426.]

Gaynor admitted that he burglarized the Buellton Burger King on February 24, 1992, with Petitioner. [R.T. vol. IX at 1432.] Gaynor left Petitioner at the restaurant and waited across the street. [R.T. vol. IX at 1435.] Approximately fifteen minutes later, Petitioner used the walkie talkie to ask Gaynor to pick him up. [R.T. vol. IX at 1436–37.] Gaynor recalled that Petitioner obtained an amount of money from the burglary, but could not remember the amount. [R.T. vol. IX at 1438.]

Gaynor admitted that on February 26, 1992, he burglarized the Buellton McDonald's with Petitioner. [R.T. vol. IX at 1439–42.] Gaynor also admitted that he and Petitioner burglarized the Buellton Burger King a second time on March 2, 1992. [R.T. vol. IX at 1444–47.] Finally, Gaynor admitted he burglarized the Bob's Big Boy in Carpinteria with Petitioner on March 3, 1992. [R.T. vol. IX at 1450–52.]

### *Petitioner's Testimony*

Petitioner presented what he called the "superior knowledge" defense. Petitioner testified that he would not have committed the burglaries in the manner in which they were done, because he had superior knowledge of safecracking techniques that would have permitted him to open the safes more easily. [R.T. vol. XIII at 2237–42, 2246–63.]

Petitioner testified that Gaynor's testimony was false. [R.T. vol. XIII at 2214, 2303.] Petitioner also explained that on the night of his arrest, he had traveled to Buellton with Gaynor in order to sell his safecracking equipment to Gaynor's friend Steve. [R.T. vol. XIII at 2187.]

### *The Verdict*

On March 18, 1993, a jury convicted Petitioner of five counts of second degree burglary. [C.T. 301.] The jury also found that Petitioner had served two prior prison terms within the meaning of California Penal Code § 667.5. [C.T. 301.] The trial court subsequently struck one of the prior prison term allegations for insufficient evidence. [R.T. vol. XIV at 2538.] The trial court sentenced Petitioner to six years and eight months in state prison. [C.T. 434–35.] On January 5, 1995, the California Court of Appeal affirmed the conviction. [Return, ex. D.]

## III. *DISCUSSION*

### A. FACTUAL BASIS OF CLAIM TWO

#### 1. Alleged Conflict of Interest as to William Gaynor

Petitioner claims his Sixth Amendment right to conflict-free representation was

violated because Petitioner's trial attorney, James Voysey, encouraged Gaynor to accept a plea offer and testify against Petitioner. Gaynor initially was charged as an accomplice to the same five burglaries charged against Petitioner. [C.T. 1–5.] Petitioner submits Gaynor's declaration, in which Gaynor explains that prior to trial, the prosecution offered him a plea bargain in exchange for his testimony against Petitioner. [Exhibits in Support of Petition, ex. Y, Gaynor Declaration at ¶ 2.] Gaynor says he did not want to make a decision regarding the offer until he learned the results of the defense investigation of the case. [Exhibits in Support of Petition, ex. Y, Gaynor Declaration at ¶ 3.] When Gaynor's attorney became ill during pretrial proceedings, Voysey coordinated the hiring of expert witnesses and other investigative matters. [Exhibits in Support of Petition, ex. Y, Gaynor Declaration at ¶ 3.] As a result, Gaynor "frequently" contacted Voysey by telephone to inquire about the status of the investigation. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 3; ex. Y, Gaynor Declaration at ¶ 3.]

During some of these conversations, Gaynor asked Voysey "whether he should accept the prosecution's offer to plead guilty and testify against" Petitioner. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 3; ex. Y, Gaynor Declaration at ¶ 3.] Voysey states that he told Gaynor that Petitioner "was going to be convicted and sent to prison in this case regardless of Gaynor's actions." [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 3; ex. Y, Gaynor Declaration at ¶ 3.] Gaynor states that this information made his decision easier because it reduced the amount of guilt he felt about testifying against his brother. [Exhibits in Support of Petition, ex. Y, Gaynor Declaration at ¶ 3.]

Gaynor was appointed new counsel, Michael Shean, in December 1992. [C.T. 240.] Shortly thereafter, Gaynor and Shean met with the prosecutor to discuss the plea bargain. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 4; ex. Y, Gaynor Declaration at ¶ 4.] Shean states that he thought the prosecution's offer was a good one for Gaynor. He advised Gaynor that the evidence against him and Petitioner was overwhelming, and that Gaynor should accept the prosecution's offer. [Opposition to Petitioner's Motion for Summary Judgment, Shean Declaration at ¶ 2.]

During the meeting, Gaynor told the prosecutor that he and Petitioner committed only two burglaries. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 4; ex. Y, Gaynor Declaration at ¶ 4.] The prosecutor accused Gaynor of lying and stated that Gaynor would have to tell the truth about his involvement in all of the burglaries in order to receive the deal. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 4; ex. Y, Gaynor Declaration at ¶ 4.] Voysey states that "[a]fter the district attorney left the room, and Gaynor's attorney advised Gaynor to tell the truth, I also told Gaynor to tell the truth." [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 4.] Shean states that, in addition, "Mr. Voysey told Mr. Gaynor he would be a fool not to accept the prosecution's offer." [Respondent's Opposition to Petitioner's Motion for Summary Judgment, Shean Declaration at ¶ 4.][3]

Petitioner alleges that these contacts between Voysey and Gaynor gave rise to an unconstitutional conflict of interest.

---

3. Shean states that Voysey did not join the meeting until after the prosecutor left the room. [Respondent's Opposition to Petitioner's Motion for Summary Judgment, Shean Declaration at ¶ 4.] When Gaynor told Voysey about the plea offer, Voysey said that Petitioner "was going to be convicted regardless of what Mr. Gaynor did," and "told Mr. Gaynor he would be a fool not to accept the prosecution's offer." Shean also states that "Mr. Voysey did not offer Mr. Gaynor any legal advice." [Respondent's Opposition to Petitioner's Motion for Summary Judgment, Shean Declaration at 1, ¶ 4.]

### 2. Alleged Conflict of Interest as to Joan Picha

Petitioner also claims his Sixth Amendment right to conflict-free representation was violated by statements Voysey allegedly made to Petitioner's mother, Joan Picha. Apparently, Picha offered to testify at trial on Petitioner's behalf. [Exhibits in Support of Petition, ex. J, Picha Declaration at ¶ 11.] Neither Picha nor Petitioner have stated what that testimony would have been, Petitioner merely alleges that Picha's testimony "would have been probative at trial and would have helped the defence (sic)." [Memorandum in Support of Petition for Writ of Habeas Corpus at 8:16–18.] Voysey allegedly told Picha that she should not testify because Petitioner would be convicted regardless of her testimony and that, if she did testify, she could be subject to criminal prosecution for previously obtaining a false driver's license. [Exhibits in Support of Petition, ex. J, Picha Declaration at ¶ 11.] Petitioner argues that this constituted "conflicting legal advice," which had an adverse effect on the outcome of his trial. [Memorandum in Support of Petition at 9:16–17.]

### 3. Post-Trial Proceedings

After the verdict was rendered, Petitioner filed two motions for new counsel with the trial court. The first motion was handwritten and alleged a conflict of interest created by Voysey's statements to Gaynor.[4] [C.T. 393–95.] The second motion was typewritten, and contained an exhaustive discussion of Voysey's alleged failure to prepare for trial adequately and present the case to the jury. [C.T. 396–409.] The trial court granted Petitioner's request for new counsel on the basis of the second, typewritten motion. [R.T. vol. XIV at 2531; C.T. 392.] The court stated that it had not read the first, handwritten motion, which raised the conflict of interest issue. [R.T. vol. XIV at 2531.]

The court appointed a new attorney to represent Petitioner at sentencing. [R.T. vol. XIV at 2531.] The new attorney filed a motion for new trial, asserting, among other things, that Voysey had a conflict of interest because he gave legal advice to Gaynor. [C.T. 413, 423–25.] The trial court denied the motion without a hearing. [R.T. vol. XIV at 2538.]

Petitioner's appellate attorney raised claim two before the California Court of Appeal in a habeas corpus petition filed concurrently with Petitioner's direct appeal. [Return, ex. E.] The petition was denied without citation of authority. [Return, ex. F.] The California Supreme Court denied Petitioner's petition for review of the Court of Appeal's decision without citation of authority. [Return, exs. I & J.]

### B. *TEAGUE v. LANE*

■ Respondent contends that summary judgment should be granted in its favor on claim two because claim two is barred by the doctrine of retroactivity enunciated in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The *Teague* doctrine provides that new constitutional rules of criminal procedure will not be applied retroactively on collateral review of a final conviction. *Teague v. Lane*, 489 U.S. at 310, 109 S.Ct. 1060 (plurality opinion). A case announces a "new rule" under *Teague* if " 'the result was not dictated by precedent existing at the time the defendant's conviction became final.' " *Goeke v. Branch*, 514 U.S. 115, 118, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995) (per curiam) (quoting *Teague v. Lane*, 489 U.S. at 301, 109 S.Ct. 1060).

■ Prior to the commencement of Petitioner's trial in 1993, it was well established that the Sixth Amendment right to counsel encompasses the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S.

---

4. Petitioner asserts that he first learned of Voysey's statements to Gaynor and Picha after the jury reached its verdict. [Exhibits in

Support of Petition, ex. Z, Petitioner's Declaration at ¶¶ 2 & 3.]

261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *see also Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *In Cuyler v. Sullivan,* the Supreme Court held that to establish a conflict of interest, a habeas petitioner must show: (1) his attorney actively represented conflicting interests; and (2) the conflict of interest adversely affected his attorney's performance. *Cuyler v. Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708.

By its very terms, the *Cuyler* standard "is a rule of general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts." *See Wright v. West,* 505 U.S. 277, 309, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (*Kennedy, J., concurring*). The fact that the Supreme Court has not had an occasion to apply the *Cuyler* standard to a situation identical to the one presented in Petitioner's case does not render its application here a "new rule." *See Chambers v. United States,* 22 F.3d 939, 942 (9th Cir.1994), *vacated on other grounds,* 47 F.3d 1015 (9th Cir.1995) (the court does not create a new rule when it applies a rule of general application to a new set of facts); *Beam v. Paskett,* 3 F.3d 1301, 1310 (9th Cir.1993), *cert. denied,* 511 U.S. 1060, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994) (same); *see also Wright v. West,* 505 U.S. at 308, 112 S.Ct. 2482 (Kennedy, J., concurring) ("If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule").

5. The Sixth Amendment right to effective assistance of counsel is comprised of "two correlative rights: the right to reasonably competent counsel and the right to counsel's undivided loyalty." *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1251 (9th Cir.1989). Petitioner's claim two, which is the only

The application of the *Cuyler* standard in this case would not constitute a new rule of law and Petitioner's claim two is not barred by the *Teague* doctrine.

## C. CONFLICT OF INTEREST

■ Petitioner argues that his Sixth Amendment right to conflict-free representation was violated.[5] Respondent contends that Petitioner's factual allegations do not describe a conflict of interest as a matter of law.

■ "Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. 2052. Thus, the Sixth Amendment right to counsel encompasses the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. at 271, 101 S.Ct. 1097.

■ As stated previously, in *Cuyler v. Sullivan,* the Supreme Court held that when a habeas petitioner fails to make a timely objection to his trial counsel, to establish a conflict of interest, the petitioner must show: (1) his attorney actively represented conflicting interests; and (2) the conflict of interest adversely affected his attorney's performance. *Cuyler v. Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708; *see Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. 2052. Once it is established that an actual conflict of interest adversely affected the attorney's performance, prejudice is presumed. *Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. 2052; *Cuyler v. Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708.

claim at issue in these cross-motions, involves only the latter of these two rights. Petitioner's challenges to his counsel's competence, which require a showing of prejudice to Petitioner, are contained elsewhere in his petition.

The cases following *Cuyler* have held that "[c]onflicts of interest can arise both in cases of simultaneous representation and successive representation...." *Fitzpatrick v. McCormick,* 869 F.2d 1247 (9th Cir.1989); *see also Sanders v. Ratelle,* 21 F.3d 1446, 1453 (9th Cir.1994); *U.S. v. Rewald,* 889 F.2d 836, 857–58 (9th Cir. 1989); *Thomas v. Municipal Court,* 878 F.2d 285, 288 (9th Cir.1989).[6] Accordingly, the first issue to be determined is whether Voysey ever "represented" either Gaynor or Picha. Absent such a relationship, claim two must fail.

### 1. The Attorney–Client Relationship

■ Under California law, an "attorney-client relationship is created by some form of contract, express or implied, formal or informal." *Responsible Citizens v. Superior Court,* 16 Cal.App.4th 1717, 1732, 20 Cal.Rptr.2d 756 (1993). At issue here is whether there existed an implied contract for representation between Voysey and either Gaynor or Picha. "An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ.Code § 1621. "The distinction be-

tween express and *implied in fact* contracts relates only to the *manifestation of the assent;* both types are based upon the expressed or apparent intention of the parties." 1 Witkin, Summary of Cal.Law (9th ed. 1987) Contracts, § 11, p. 46 (emphasis in original).

■ In determining whether an attorney-client relationship is created on the basis of an implied contract, the court examines the totality of the circumstances. *Id.* at 1733, 20 Cal.Rptr.2d 756. Some of the factors to consider are: (1) the nature and extent of the contacts between the attorney and the purported client, *Responsible Citizens,* 16 Cal.App.4th at 1733, 20 Cal.Rptr.2d 756; *Fox v. Pollack,* 181 Cal. App.3d 954, 959, 226 Cal.Rptr. 532 (1986); (2) whether the purported client divulged confidential information to the attorney, *id.;* (3) whether the attorney provided the purported client with legal advice; *id.; see also United States v. Bauer,* 132 F.3d 504, 508–09 (9th Cir.1997); and (4) whether the purported client sought or paid for the attorney's services. *Fox v. Pollack,* 181 Cal.App.3d at 959, 226 Cal.Rptr. 532.[7]

---

**6.** The court is aware of no case where *Cuyler* has been applied in a situation where the attorney did not in fact *represent* clients with allegedly conflicting interests, either simultaneously or successively. There may be extreme situations, however, where *Cuyler* would apply even absent an attorney-client relationship. For example, if Gaynor was Voysey's brother, rather than Petitioner's, or had some other special relationship with Voysey (e.g., father, cousin, long time friend, etc.), rather than Petitioner, and if Voysey, because of this special relationship with Gaynor, encouraged Gaynor to act to protect himself at the cost of Petitioner's defense, then a court might apply *Cuyler* to find an unconstitutional conflict of interest. Such a situation is not before the court. Petitioner has made no allegation, and no showing, that Voysey had any special relationship with Gaynor, or any reason whatsoever to encourage Gaynor to act in a manner that Voysey would believe to be adverse to Petitioner.

The record makes clear that Voysey did not give helpful advice to Gaynor in order to harm Petitioner. The question then is whether a conflict of interest arises when an attorney encourages a witness to testify against his client, regardless of the attorney's good faith.

If there is dual representation or if a special relationship exists between the attorney and the testifying party, the answer may be yes. If there is no such relationship, there is no conflict under *Cuyler.* Rather, a petitioner would have to challenge his counsel's competence, and show prejudice.

Here, Petitioner was not entitled to have Gaynor lie for him. It is clear that Voysey believed that if Gaynor testified in Petitioner's favor, Gaynor's testimony would be perjurious. In this situation, it was appropriate for Voysey to encourage Gaynor to testify truthfully and reassure Gaynor that his testimony ultimately would not harm Petitioner.

**7.** The conclusory statements by Petitioner and Gaynor that Voysey "advised" Gaynor are irrelevant. "The question of whether an attorney-client relationship exists is a matter of law." *Responsible Citizens,* 16 Cal.App.4th at 1733, 20 Cal.Rptr.2d 756. The question to be considered by the court is "whether the totality of the circumstances, including the parties' conduct," implies an attorney-client relationship. *Id.* Even if Gaynor or Picha believed that Voysey represented them, which they do not specifically allege, it does not establish an

Viewing all of the evidence in the light most favorable to Petitioner, the court concludes that no attorney-client relationship existed between Voysey and either Gaynor or Picha.

## 2. The Relationship Between Voysey and Gaynor

The record indicates that Gaynor first contacted Voysey when Gaynor's first attorney became "extremely ill." [Exhibits in Support of Petition, ex. Y, Gaynor Declaration at ¶ 3.] Both Gaynor and Voysey state that Gaynor "frequently" contacted Petitioner's attorney to discuss the investigation of the case. [Exhibits in Support of Petition, ex. X, Voysey Declaration at ¶ 3; ex. Y, Gaynor Declaration at ¶ 3.]

Petitioner points to three specific statements by Voysey to support the argument that Voysey represented Gaynor. First, Voysey told Gaynor that Petitioner was going to be convicted and sent to prison regardless of what Gaynor did, which made Gaynor's decision to testify easier. [Exhibits in support of Petition, ex. X, Voysey Declaration at ¶ 3; ex. Y, Gaynor Declaration at ¶ 3.] Second, during plea negotiations, after Gaynor's own attorney, Shean, advised Gaynor to "tell the truth," Voysey also told Gaynor to "tell the truth." Third, Voysey also told Gaynor that "he would be a fool not to accept the prosecution's offer." [Respondent's Opposition to Petitioner's Motion for Summary Judgment, Shean Declaration at ¶ 4.]

Although both Gaynor and Voysey characterize their conversations as "frequent," there is no evidence that Gaynor ever divulged any confidential information to Voysey or that Gaynor ever compensated Voysey for any services. Neither Gaynor or Voysey even claim that they believed an attorney-client relationship existed,[8] or that Gaynor was obligated to compensate Voysey for the "advice" rendered.

attorney client relationship. *Fox v. Pollack,* 181 Cal.App.3d at 959, 226 Cal.Rptr. 532.

Petitioner does not allege, and the record does not suggest, that any legal advice was given during any of the numerous contacts between Gaynor and Voysey to discuss the progress of the investigation of the case. Petitioner does assert, however, that the three specific statements enumerated above constituted legal advice.

■ The second and third of these statements were made in the presence of Gaynor's own counsel Shean. Petitioner and Gaynor were co-defendants in the case. Separate counsel had been appointed for each, and both were aware that they were separately represented. The court believes that there is nothing unusual or inappropriate about counsel for co-defendants sharing candidly their respective views concerning the case with all defendants, when each counsel is present. Even if the sharing of these views might constitute "legal advice," it does not create a joint representation, or create an unethical conflict. In this instance, the particular statements were almost certainly interpreted by Gaynor as personal reassurance that acceptance of the plea offer would not hurt his brother, rather than as an undertaking of joint representation with his counsel, who was present.

■ The other statement made by Voysey to Gaynor that Petitioner was going to be convicted regardless of Gaynor's actions was certainly understood by Gaynor in the same way. According to Gaynor, it made his decision to testify "easier." Gaynor has not suggested that he interpreted this statement as directed to the legal or factual merits of his own case, or that it influenced his analysis in any way other than to alleviate his concern that by accepting the plea bargain he would be hurting his brother. Even with that concern allayed, Gaynor did not ask Voysey if he would go forward and negotiate the plea bargain for him, but rather waited

8. Even if Voysey or Gaynor now claimed that they believed an attorney-client relationship existed, that belief would be unreasonable based upon the undisputed facts.

**1062**

until new separate counsel had been appointed for him.

There are no facts to support any reasonable inference that an attorney-client relationship existed between Gaynor and Voysey.[9] Accordingly, Petitioner cannot show the existence of an unconstitutional conflict of interest as to Gaynor.

### 3. The Relationship Between Voysey and Picha

 Petitioner argues that Voysey's relationship with Picha also created an unconstitutional conflict of interest. The relevant contact between Voysey and Picha appears to have been limited to one conversation in December 1992. Picha states that, during this conversation, Voysey told her she should not testify at Petitioner's trial because Petitioner would be convicted regardless of her testimony and because Picha could be subject to prosecution for obtaining a false driver's license. [Exhibits in Support of Petition, ex. J, Picha Declaration at ¶ 11.] This does not evidence the existence of an attorney-client relationship. The contact between Voysey and Picha was very limited. It is not clear from whom Voysey learned of the potential for criminal charges against Picha, but it appears that Voysey used that information not to render legal advice to Picha, but to assess the viability of Picha as a witness. Voysey's assessment that Picha's testimony would not be helpful to Petitioner's defense does not show that Voysey represented Picha. There is also no evidence that Picha sought advice from Voysey or that Picha was obligated to pay Voysey following their conversation.

No attorney-client relationship existed between Voysey and Picha and, accordingly, Petitioner's Sixth Amendment right to conflict-free counsel was not violated.

### ORDER

IT IS HEREBY ORDERED that Respondent's motion for summary judgment be GRANTED and that Petitioner's motion for summary judgment be DENIED.

IT IS SO ORDERED.

---

9. Voysey's statements were made in a situation where, in Voysey's view, Gaynor could do nothing to worsen Petitioner's chances at trial, but could significantly worsen Gaynor's own position by failing to testify. In these circumstances, there was no reason why Voysey should not have done the decent thing and told Gaynor that his actions would be harmless to Petitioner. The court will not discourage an attorney from making such statements where, as here, those statements will have no ultimate effect on the client.