Rickey A. BILLINGSLEA,
Petitioner–Appellant,

v.

Andrew JACKSON, Warden,
Respondent–Appellee.

No. 02–1225.

United States Court of Appeals,
Sixth Circuit.

Nov. 21, 2003.

Rickey A. Billingslea, pro se, Ionia, MI, for Petitioner–Appellant.

Brad H. Beaver, Office of the Attorney General, Lansing, MI, for Respondent–Appellee.

Before BOGGS, Chief Judge; NORRIS and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Petitioner, a *pro se* Michigan prisoner, appeals a February 7, 2002 order, entered by the district court, denying Petitioner's request for habeas relief, pursuant to 28 U.S.C. § 2254. Petitioner is currently serving a life sentence for his August 1996, jury trial conviction for first-degree felony murder. For the reasons set forth below, we AFFIRM the district court.

BACKGROUND

In August of 1996, a Michigan trial court jury found Petitioner guilty of first-degree felony murder and home invasion. Petitioner received life imprisonment for the murder conviction and ten to fifteen years for home invasion. Petitioner appealed to the Michigan Court of Appeals, which, in an unpublished opinion, affirmed the conviction and sentence for felony murder and reversed the conviction for home invasion. *See People v. Billingslea*, No. 199124 (Mich.Ct.App. June 23, 1998) (per curiam).

The Michigan Supreme Court denied Petitioner's request for leave to appeal the conviction for felony murder, in an unpublished order. *See People v. Billingslea,* No. 112585 (Mich. Mar.30, 1999). Petitioner then petitioned for habeas relief pursuant to 28 U.S.C. § 2254, which the district court denied on February 7, 2002. (J.A. at 131.) This timely appeal followed.

The substantive facts are described in the opinion of the Michigan Court of Appeals. (J.A. at 86–93.) On June 9, 1995, Walter Norfolk, an elderly man, was in his home in Detroit, Michigan. Petitioner's confession to the police, read into the record at trial, states that Petitioner kicked in Norfolk's door and entered the residence. An alcoholic, intoxicated at the time, Petitioner entered in search of money to buy more alcohol. When Petitioner came upon Norfolk inside the house, Petitioner "smacked him in the cheek area, and he fell down." Petitioner then took a shotgun and ammunition from Norfolk's home and drove away in Norfolk's car.

The next day, Detroit police stopped Petitioner, subduing him with pepper gas after a struggle. Petitioner received *Miranda* warnings and did not immediately make any statement to police. Two days later, though, Petitioner confessed to the account of the encounter with Norfolk, as described above. Meanwhile, on June 11, 1995, several of Norfolk's relatives became concerned about his safety when they noticed that his door was not securely closed. Upon entering the house, Norfolk's relatives found him lying unconscious. Norfolk remained unconscious in a coma until his death, approximately two months later.

At trial, the government offered expert testimony indicating that Norfolk died from complications related to his head injury, stating that a blow or blunt force impact to Norfolk's head caused bleeding and blood clotting in his brain and a nor-

mally irreversible coma. The experts testified that the immediate cause of death might have been serious bedsores that developed while Norfolk was in the hospital and may have resulted from his coma, age and circulatory problems, and may have been aggravated by his preexisting heart condition.

## DISCUSSION

This Court reviews a district court's decision to grant or deny a habeas writ *de novo. Lucas v. O'Dea,* 179 F.3d 412, 416 (6th Cir.1999) (citing *Fair v. United States,* 157 F.3d 427, 430 (6th Cir.1998)); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir.1997).

Federal courts evaluate habeas petitions according to the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. § 2254 (Supp.2002) ("AEDPA")). *Harpster,* 128 F.3d at 326. AEDPA's objective is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted). The statute provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determina-

tion of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412–13, 120 S.Ct. 1495; *see also McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir.2000). An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

Under this standard, a state court decision is not unreasonable simply because the federal court concludes that the decision is erroneous or incorrect. *Id.* at 411, 120 S.Ct. 1495. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12, 120 S.Ct. 1495; *see also McGhee*, 229 F.3d at 510. Finally, the *Williams* Court emphasized that "clearly established Federal law, as determined by the Supreme Court" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495.

Petitioner raises five arguments: judicial bias, violation of *Miranda* rights, insufficient evidence, improper jury instructions, and cumulative error. We take these issues in order.

## I.

Petitioner claims judicial bias. Judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal." *Maurino v. Johnson*, 210 F.3d 638, 644 (6th Cir.2000). Thus, we do not review judicial bias for harmless error.

Petitioner points to several instances which, he claims, demonstrate the trial court's bias. Petitioner points to the following statement, during *voir dire:*

> COURT: Ms. Madden [defense counsel], nobody can ask any question like that. Who knows. This stuff comes, you make a judgment. Don't drive people into places they don't want to go in order for you to make an assessment.

Petitioner points to the trial court's rejection of some of defense counsel's objections:

> COURT: Ms. Madden, everybody can testify to the state of health, because people notice different things. There is nothing wrong with that question. We are not asking him about in-depth disease or fundamental illness. She is asking how the disease seemed to be getting along.

Petitioner cites to points at which the trial judge interrupted defense counsel *sua sponte:*

> COURT: Ms. Madden?
>
> MADDEN: Yes, judge. I'll just ask one question and move on.
>
> COURT: I am curious of the materiality of this case. What materiality does it have?
>
> MADDEN: Well, as to the extent of the situation in the house, the ransacking.
>
> COURT: What is the materiality?
>
> MADDEN: I think it is material, I think I can tie it in.

COURT: I know you wouldn't be asking these questions if you didn't think it was material.

MADDEN: I will move on.

COURT: Right.

Petitioner claims the trial court engaged in unnecessary dialogue with defense counsel:

COURT: That's why sometimes we take up a whole lot of time on things which are not material to the issue. You say the issue is what his intent was. There are a whole lot of questions which you ask which take up hours and hours and there is no necessity for it.

. . . .

COURT: I am saying some of the things, I think, just simply were not material. I was just trying to determine if that was not–I might be mistaken, but I wanted to be sure that's what you said to the jury, and that he acknowledges that he did attack the deceased. Is that correct or not correct?

MADDEN: Judge, my concern in terms of my sum of my cross-examination was the implication that the house was gone through and ransacked by [Petitioner], which is inconsistent with his statement, which I think also enables me to argue he hadn't beaten him and gone through his house. That's not what we want the jury to think. That's why I asked him some questions about the house being ransacked, about the two-day time lag, and I think I did limit the questions to what was material.

Finally, Petitioner claims the court hindered counsel's ability to ask certain witnesses allegedly relevant medical questions:

MADDEN: But one thing I am concerned about, I wanted the record to reflect, that when the medical examiner testified yesterday, I felt the court did unduly restrict my ability to cross-examine. I am quite concerned about that.

COURT: In what respect, ma'am? In what respect?

MADDEN: Well, there was testimony from Dr. Cassin who performed the medical exam that I thought was contradictory to the testimony that was given by Dr. Kanluen. When I attempted to cross-examine the doctor on that issue the court would not allow me. And I think it is important, particularly given this case where the cause of death–

COURT: You see, you know one thing that really presents difficulty, Dr. Kanluen said that you gave, I think the word he used was thrust the examination transcript at him when he came in. He said he had been here only moments; he had not read it. I don't think anyone, maybe Ms. Carter knew–I didn't have a clue as to what you were doing. Didn't have a clue as to what you were doing. If you want to call him back, call him back.

MADDEN: Well, I may do that then if the court will allow me to cross-examine on the issues. I would like the record to reflect I gave him the exam transcript when he came in, some fifteen or twenty minutes.

. . . .

MADDEN: Well, I think the court restricted his testimony to the extent he answered that the heart condition would have been the cause of death which was contrary to what he said initially. I think that the court's interjection at that time was detrimen-

tal to [Petitioner].[1]

An impartial judge is a necessary component of a fair trial. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927). The Supreme Court explained, "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." *Carter v. Kentucky*, 450 U.S. 288, 302, 101 S.Ct. 1112, 67 L.Ed.2d 241 n. 20 (1981) (quoting *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894)). As this Court noted in another recent habeas appeal, when considering judicial bias claims, this Court "looks to the Supreme Court's decision in *Liteky v. United States* to provide the standard." *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir.2002) (applying *Liteky* under AEDPA).

In *Liteky*, the Court cautioned that a "judge's ordinary efforts at courtroom administration–even a stern and short tempered judge's ordinary efforts at courtroom administration–remain immune." *Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). "Expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display do not establish bias or partiality." *Id.* at 555–56, 114 S.Ct. 1147.

In the present case, the trial judge did display some abruptness toward defense counsel, but the Michigan Court of Appeals found that the trial court's occasional comments did not permeate the trial. (J.A. at 108.) The Michigan Court of Appeals also noted that the trial court remained courteous and did not confine its criticism to the defense counsel. (J.A. at 108.)

Additionally, some of the trial court's interruptions were reasonable. When the trial court called defense counsel's questions about the ransacking "immaterial," the court was correct. Petitioner admitted breaking into the victim's home, striking him, and stealing things. The question before the jury was Petitioner's intent when he struck the victim and whether that blow caused his death, not whether someone else broke into the house and beat the victim.

Moreover, the trial court was not unreasonable in limiting defense counsel's ability to cross-examine the medical examiner about a report he had not read, particularly when the court offered to let the defense recall him later. Although the trial judge stopped defense counsel from claiming in her closing argument that the victim's bedsores caused his death, Petitioner never offered any evidence that grossly negligent hospital care caused the bedsores. Under Michigan law, any lesser showing would not absolve Petitioner of full responsibility for Norfolk's death. *See People v. Bailey*, 451 Mich. 657, 549 N.W.2d 325, 334–35 (1996). Defense counsel questioned the victim's attending physician about bedsores, but failed to produce any evidence of gross negligence. (J.A. at 109.) In contrast, Dr. Ljubisa Jovan Dragovic, Chief Forensic Pathologist of Oakland County, testified that the victim's bedsores were a direct result of his being rendered comatose and thus unable to move. (J.A. at 110.) The trial court acted appropriately by limiting inquiry and argument related to the victim's bedsores.

---

1. Defense counsel is complaining about her ability to attribute the victim's death to infected bedsores, as opposed to Petitioner's assault.

None of the judge's behavior fell beyond the bounds, articulated in *Liteky,* of a judge's ordinary efforts at courtroom administration. The Michigan Supreme Court's refusal to overturn the conviction on the basis of judicial bias was not contrary to clearly established federal law.

## II.

Petitioner claims a violation of his *Miranda* rights. When examining the arresting officer, the prosecutor elicited testimony indicating that Petitioner chose to remain silent after his arrest:

PROSECUTOR: Was there anything remarkable about the arrest?

OFFICER: A struggle ensued. He didn't wish to be arrested, obviously. We had to struggle for awhile, and I believe my Lieutenant had to spray him with pepper gas to subdue him.

PROSECUTOR: Did you read him his rights?

OFFICER: Yes, ma'am.

PROSECUTOR: As a result of reading him his rights, did he say or do anything?

OFFICER: Other than I asked him, I read him his rights and asked him if he understood; other than that, nothing.

No objection to this was raised by Defendant at trial, but none was needed under Michigan law to preserve the issue on appeal. The Michigan Court of Appeals ruled that Petitioner's Fifth Amendment rights were not violated. The district court ruled that Petitioner's Fifth Amendment rights were violated but that it was harmless error. We agree with the district court's ruling.

In *Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court explained that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Petitioner claims that the officer's testimony violated *Doyle.* A footnote in *Doyle* stated that in certain instances, a defendant might open the door for post-arrest silence to be introduced as evidence by the government:

It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild,* 505 F.2d 1378, 1383 (C.A.5 1975).

*Id.* at 620 n. 11, 96 S.Ct. 2240. As it is stated in this footnote, the *Doyle* exception has three requirements: (1) a defendant must have testified (2) to an exculpatory version of events (3) that the defendant told police at the time of arrest.

The present case does not fit within *Doyle's* opening-the-door exception. In her opening statement. Defense counsel stated:

[A]s we explained to you specifically in voir dire, and the Judge will explain to you, felony murder not only requires a felony and requires a death, but it requires a certain degree of what the Courts commonly call malice; that you intend your act to either cause death or great bodily harm or knowing that it will.

Why is that important? Because if Mr. Billingslea did strike Mr. Norfolk, and he admitted that to the police, and he also discussed his alcohol problem, his remorse, he was cooperative, and unfortunately Mr. Norfolk did languish and ultimately pass.

Also, as the Michigan Court of Appeals stated, "defense counsel later elicited testimony from a police investigator to the effect that defendant, the day after his arrest, was both cooperative and concerned for the well-being of the victim." (J.A. at 90.)

■ Without deciding if the first requirement of *Doyle* is a *per se* requirement-i.e., without deciding whether the exception can ever apply in cases, such as the present one, in which the defendant did not testify-we rule that the *Doyle* exception was inapplicable, on the grounds that none of the requirements were met.

The second requirement of the *Doyle* exception is that the defense stated at trial that the defendant presented "an exculpatory version of events" to the police. "Remorse" is a mental state. A person may be remorseful without making a statement to the police, as to an exculpatory version of events. A person can be "cooperative" by merely not resisting arrest,[2] or by behaving in other ways that do not involve telling police an exculpatory version of events. The *Doyle* exception can be invoked by the government "to contradict a defendant." 426 U.S. at 620 n. 11, 96 S.Ct. 2240. Petitioner's post-arrest silence was not contradictory to counsel's statements that Petitioner had been remorseful and cooperative.

The third requirement of the *Doyle* exception is that a defense "claims [a defendant] ... told the police the same version upon arrest." In the present case, the statement elicited by defense counsel from the police investigator was that Petitioner was remorseful and cooperative "the day after his arrest." This does not fall within the requirement that the defense introduces evidence that a defen-

dant told the police an exculpatory version of events "upon arrest." The *Doyle* exception allows the government "to contradict a defendant." *Id.* Petitioner's silence immediately following his arrest was not contradictory to evidence relating to Petitioner's behaving the day after the arrest.

■ Although the *Doyle* exception was inapplicable, the government's violation of Defendant's *Miranda* rights was not sufficient error to reverse the conviction. The Supreme Court distinguishes between two types of constitutional errors: structural error and trial error. *See Arizona v. Fulminate*, 499 U.S. 279, 306–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is *per se* prejudicial," whereas "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." *Yohn v. Love*, 76 F.3d 508, 522 (3d Cir.1996) (citations omitted). The Supreme Court explained that *"Doyle* error fits squarely into the category of constitutional violations which we have characterized as trial error." *Brecht v. Abrahamson*, 507 U.S. 619, 629, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The *Brecht* rule applies even when the "federal habeas court is the first to review for harmless error." *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir.1999).

Under *Brecht*, a *Doyle* error only warrants reversal if the mistake "had substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. A "reasonable possibility" that the error influenced the outcome is not enough to warrant relief. *Id.* Rather, the defendant must show a "reasonable probability" that the error af-

---

**2.** That Petitioner in the present case did in fact resist arrest does not allow testimony that he remained silent after the arrest, to im- peach Defense counsel's account of his having been "cooperative."

fected the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The present case is not distinguishable on its facts from *Brecht*, 507 U.S. at 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that the state's improper use of the defendant's post-*Miranda* silence to impeach the defendant's claim that shooting was accidental did not have substantial and injurious effect or influence in determining jury's verdict and thus was harmless error).

There is no reasonable probability that Petitioner's silence following his arrest influenced the jury's decision. It is highly improbable that Petitioner's post-arrest silence was a factor in the jury's decision to find that Defendant had the requisite *mens rea* for felony murder. Petitioner admitted that he struck Norfolk on the head, knocking him to the floor, and then left Norfolk lying unconscious. Without being aware of his post-silence arrest, the jury easily could have concluded that Defendant knew that his acts would cause death or great bodily harm.[3] There is not a reasonable probability that the Fifth Amendment violation affected the verdict. The Michigan Supreme Court's allowing the conviction to stand was not inconsistent with established federal law, and thus does not provide grounds for our reversing the conviction.

### III.

Petitioner challenges the sufficiency of the evidence. Under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), evidence is sufficient to support a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original). This Court may not re-weigh evidence or redetermine witness credibility. *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear on the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

Petitioner argues that he did not intend to kill the victim. Being in superior physical condition to Norfolk, Petitioner claims he could have killed him immediately had he intended to murder. According to Petitioner, he acted only to get money for more liquor and not to do violence. Second, Petitioner claims that Norfolk could have died from some other cause. Norfolk had difficulty walking and could have fallen on his own.[4]

■ Even if Petitioner lacked the specific intent for first-degree murder, under Michigan law, "[f]elony murder only re-

---

3. Under Michigan law, felony murder (Mich. Comp. Laws § 750.316(1)(b)) requires an intent to either kill or cause great bodily harm, or a knowledge that the act will probably cause death or great bodily harm. *See, e.g., People v. Herndon*, 246 Mich.App. 371, 386, 633 N.W.2d 376 (Mich.Ct.App.2001) ("Second-degree murder is a general intent crime, which mandates proof that the killing was 'done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge

that the act probably will cause death or great bodily harm.' Felony-murder is also a general intent crime, requiring evidence of one of the three intents necessary to prove second-degree murder.") (citations omitted).

4. Petitioner evidently does not argue that subsequent poor medical care caused Norfolk's death. Even if he had raised this issue, only a showing of gross negligence would shift the blame to medical personnel. *See People v. Bailey*, 451 Mich. 657, 549 N.W.2d 325, 334–

quires the general intent necessary for second-degree murder, this including the intent to place the victim in a great risk of death or serious bodily injury with a reckless indifference to the probability that death or serious injury will result." *Billingslea,* No. 199124, slip op. at 6. *See also* note 3, *supra.* The Michigan Court of Appeals did not unreasonably conclude that striking the victim, knocking him over, and leaving him unconscious qualifies as behavior that exhibits "a reckless indifference to the probability that death or serious injury will result." *Billingslea,* No. 199124, slip op. at 6.

Regarding causation, Petitioner conceded that he struck the victim in the head and left him unconscious. It is possible that Norfolk got up, then fell again on his own, but Petitioner offered no evidence to that effect. Even if the defense presented conflicting evidence as to the cause of Norfolk's coma, this Court would still draw the necessary inference in the jury's favor. *See Wright v. West,* 505 U.S. at 296–97, 112 S.Ct. 2482.

The Michigan courts did not unreasonably apply established Supreme Court precedent to conclude that sufficient evidence supports Petitioner's felony murder conviction.

### IV.

Petitioner contends that the trial court erred by refusing to instruct the jury regarding intervening inadequate medical treatment that allegedly was one of the causes of Norfolk's death.

A criminal defendant does not have an absolute right to present evidence on his behalf. *Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (quoting *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988))

35 (1996). Petitioner offered no evidence at trial that would indicate Norfolk received

("The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). Where the trial court excludes evidence not relevant to any defense accepted by state law, no Sixth Amendment violation occurs. *See Wong v. Money,* 142 F.3d 313, 324 (6th Cir.1998) (finding proper the exclusion of expert testimony regarding diminished capacity when state law did not recognize a diminished capacity defense).

The trial court refused a requested jury instruction on the role of negligent medical care. Under Michigan law, medical errors less than gross negligence will not mitigate Petitioner's responsibility. In *Bailey,* 549 N.W.2d at 334–35, the Michigan Supreme Court stated,

> In assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm. The criminal law does not require that there be but one proximate cause of harm found. Quite the contrary, all acts that proximately cause the harm are recognized by the law. . . . [I]t is only where there is evidence that the medical treatment was grossly negligent that such treatment may be considered as an intervening cause of death, cutting off the defendant's liability.

None of the parties sets forth a definition of "gross negligence" under Michigan law. In the context of manslaughter, *People v. Sealy,* 136 Mich.App. 168, 172–73, 356 N.W.2d 614 (Mich.Ct.App.1984) states that "gross negligence" requires:

> 1. Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.

grossly negligent medical care.

2. Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand.

3. The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

(citations and internal quotation marks omitted). Elsewhere, the term appears to evade easy definition but clearly constitutes more than simple negligence.

■ Petitioner did not introduce evidence supporting a theory of the hospital's gross negligence. Petitioner sought to elicit expert testimony that would have attempted to establish that usually, when head injuries cause death, the death occurs quickly. *Billingslea*, No. 199124, slip op. at 7. This evidence alone does not appear sufficient to support a finding of simple negligence, much less gross negligence. Furthermore, according to the Michigan Court of Appeals, "Even defendant's own expert unequivocally stated, 'The manner of death in this case was homicide.... Bedsore infection would be one of the complications ... in the realm of the causation of death.'" *Id.* Petitioner does not contest this statement by the Michigan court, nor does Petitioner bring to our attention any evidence in the record that would suggest gross negligence on the part of the hospital. (Petitioner's Brief at 31–32.) Consequently, we cannot conclude that the Michigan Supreme Court violated clearly established federal law in refusing to overturn the conviction on the basis of the trial court's refusing to give the requested jury instructions.

## V.

■ Petitioner argues that cumulative error provides a basis for relief. Cumulative error is not a basis for granting habeas relief in non-capital cases.[5] Consequently, in the present case, a state court's decision to reject a defendant's cumulative error claim cannot be "contrary to ... Supreme Court decision[s] so as to warrant habeas relief under the AEDPA." *Lorraine v. Coyle*, 291 F.3d at 447.

## CONCLUSION

Based upon the foregoing, we AFFIRM the judgment of the district court.

---

5. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.2002) ("[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

A different rule applies to capital cases. In *DePew v. Anderson*, Constitutional errors that might have been harmless, taken individually, were cumulated by this Court, leading to a reversal of a death sentence. 311 F.3d 742, 751 (6th Cir.2002) (distinguishing cases in which a death sentence was imposed from other cases).